TROUTMAN SANDERS LLP
Jason S. Hartley (SBN No. 192514)
Jason M. Lindner (SBN No. 211451)
550 West B Street, Suite 400
San Diego, CA 92101
Telephone:     (619) 235-4040
Facsimile:     (619) 231-8796

*Attorneys for Plaintiffs*

*[See Additional Counsel on Signature Page]*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| **IN RE AFTERMARKET AUTOMOTIVE LIGHTING PRODUCTS ANTITRUST LITIGATION** | **09-ML-2007 GW (PJWx)** |
| | **CONSOLIDATED CLASS ACTION COMPLAINT** |
| This Document Relates to Cases: | |
| 08-cv-1158 GW | **DEMAND FOR JURY TRIAL** |
| 08-cv-7204 GW | |
| 08-cv-7634 GW | |
| 08-cv-8470 GW | |
| 09-cv-0982 GW | |
| 09-cv-0967 JFW (Notice of Related Case filed 2/23/09) | |

1.      Plaintiffs Dynacorn Autobody Parts, Inc., DJ's Autobody, Inc. d/b/a Wheeler's Autobody Supply, Prevatte Auto Supply, Inc., Nu-Parts Automotive Products, Inc., Motoring Parts International, Inc.; and Sioux Plating Co. (collectively, "Plaintiffs") bring this action on their own behalf and on behalf of all those similarly situated to recover damages and obtain injunctive relief for Defendants' violations of the federal antitrust laws with respect to the fixing of prices for, and the allocation of customers for, aftermarket automotive lighting products, also known as AM lights and AM lamps ("Aftermarket Automotive Lighting Products"). Aftermarket

Automotive Lighting Products include, but are not limited to, headlamps and bulbs, parking, tail and interior lights, spot lights, fog lights and auxiliary lights.

2.      Defendants' violations stem from their artificial manipulation of the market for aftermarket automotive lighting products.  Plaintiffs demand a trial by jury.  Plaintiffs allege on information and belief the following:

## JURISDICTION AND VENUE

3.      Plaintiffs bring this action under Sections 4 and 16 of the Clayton Act, (15 U.S.C. §§ 15 and 26) to recover treble damages and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiffs and the members of the Class by reason of the violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

4.      This action is also instituted to secure injunctive relief against Defendants to prevent them from further violations of Section 1 of the Sherman Act, as hereinafter alleged.

5.      Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1337 and by Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26).

6.      Venue is proper in this Judicial District pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C § 1391(b), (c) and (d) because, during the Class Period, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce described below has been carried out in this District.

7.      This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) participated in the sale and distribution of Aftermarket Automotive Lighting Products throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) was engaged in an illegal scheme and price-fixing conspiracy that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.  Further jurisdictional contacts are alleged below.

CONSOLIDATED CLASS ACTION
COMPLAINT

1

**PLAINTIFFS**

2      8.      Plaintiff DJ's Autobody, Inc. d/b/a Wheeler's Autobody Supply ("Wheeler's") is

3   an Iowa corporation with its principal place of business located in Waterloo, Iowa.  During the

4   Class Period, Wheeler's purchased Aftermarket Automotive Lighting Products directly from one

5   or more Defendants.  As a result of the alleged conspiracy, Wheeler's was injured in its business

6   or property by reason of the antitrust violations alleged herein.

7      9.      Plaintiff Dynacorn Autobody Parts, Inc. ("Dynacorn") is a corporation duly

8   organized and existing under the laws of the State of California with its principal place of

9   business located at 950 South A Street, Oxnard, CA 93030.  During the relevant period,

10   Dynacorn purchased Aftermarket Automotive Lighting Products directly from one or more

11   Defendants.  As a result of the alleged conspiracy, Dynacorn was injured in its business or

12   property by reason of the antitrust violations alleged herein.

13      10.      Plaintiff Motoring Parts International ("MPI") is a corporation duly organized and

14   existing under the laws of the State of North Carolina with its principal place of business located

15   at 7412 Fulton Avenue, North Hollywood, California 91605.  During the relevant period, MPI

16   purchased Aftermarket Automotive Lighting Products directly from one or more Defendants.  As

17   a result of the alleged conspiracy, Flash Sales was injured in its business or property by reason of

18   the antitrust violations alleged herein.

19      11.      Plaintiff Nu-Parts Automotive Products, Inc. ("Nu-Parts") is a corporation duly

20   organized and existing under the laws of the State of Arizona with its principal place of business

21   located at 1930 W. 3rd St., Tempe, AZ 85281.  During the relevant period, Nu-Parts purchased

22   Aftermarket Automotive Lighting Products directly from one or more Defendants.  As a result of

23   the alleged conspiracy, Nu-Parts was injured in its business or property by reason of the antitrust

24   violations alleged herein.

25      12.      Plaintiff Prevatte Auto Supply, Inc. ("Prevatte") is a corporation duly organized

26   and existing under the laws of the State of North Carolina with its principal place of business

27   located at 422 Watts Road, Lumberton, NC 28360.  During the relevant period, Prevatte

28   purchased Aftermarket Automotive Lighting Products directly from one or more Defendants.  As

CONSOLIDATED CLASS ACTION
COMPLAINT

a result of the alleged conspiracy, Prevatte was injured in its business or property by reason of the antitrust violations alleged herein.

13.     Plaintiff Sioux Plating Co. Inc. ("Sioux Plating") is a corporation duly organized and existing under the laws of the State of Iowa, with its principal place of business located at 428 East 9th Street, South Sioux City, Nebraska 68776.  During the relevant period, Sioux Plating purchased Aftermarket Automotive Lighting Products directly from one or more Defendants.  As a result of the alleged conspiracy, Sioux Plating was injured in its business or property by reason of the antitrust violations alleged herein.

<b><u>DEFENDANTS</u></b>

14.     As described in more detail herein, the Defendants are comprised of the following three pairs of Taiwanese manufacturers of Aftermarket Automotive Lighting Products and their subsidiary distributors based in the United States:  TYC / Genera; Depo / Maxzone; and Eagle Eyes / E-Lite.

**The TYC Defendants**

15.     Defendant TYC Brother Industrial Co. Ltd. ("TYC") is a corporation organized and existing under the laws of Taiwan with its principal place of business located at 72-2 Shin-leh Road, Tainan Taiwan 702.  TYC is a leading manufacturer of Aftermarket Automotive Lighting Products, which it manufactures in Taiwan and exports for sale around the world, including the United States.  TYC's website states that it "produces the most comprehensive aftermarket lamp line in the industry, in addition to designing and manufacturing Original Equipment Lamps for well known two and four wheelers [*sic*] OE vehicle manufacturers in North America, Europe, Asia Pacific, Middle East and Africa."  TYC moved into the United States market in 1994.  In early 1997, TYC issued its initial IPO, and is now traded as a public company on the Taiwan Stock Exchange.  TYC identifies itself as a member of the "TYC Group" of companies, and various press accounts during the class period identify it as a member of the "Ta Yih Group," a group of several companies including TYC and the Ta Yih Industrial Co. Ltd., a Taiwanese manufacturer of OEM car lamps.  In both 2003 and 2006, TYC estimated that it accounted for about 70% of North America's auto-insurance auto-lamp aftermarket sales.

During the Class Period, TYC sold Aftermarket Automotive Lighting Products to Class members in the United States.

16.     Defendant Genera Corporation ("Genera") is a corporation organized and existing under the laws of the State of California with its principal place of business located at 26 Centerpoint Drive, Suite 100, La Palma, California 90623.  Genera imports, distributes and sells throughout the United States Aftermarket Automotive Lighting Products imported from Taiwan, generating $178 million a year in sales.  Genera is a wholly or partially owned subsidiary of defendant TYC and was formed by TYC in 1991 to be its sole and exclusive United States distributor.  Genera states on its website that it "is the North American distribution arm of TYC," and that it operates "five massive state-of the art distribution centers, strategically located throughout the U.S., providing nearly one million sq. ft. of warehouse space."  Genera was founded in 1991 as TYC Industrial U.S.A., and changed its name in 1995 to Genera Corp. Genera estimates on its website that its 2008 sales are expected to exceed $200 million.  Genera further states that it "distributes [the] majority of its lighting, mirror, and heat exchanger products through a nation-wide network of warehouse distributors (WD's), who, in turn, market to collision bodyshops and heating/cooling system specialists.  In addition, jobber/retail locations represent a growing channel of distribution for TYC products, including most product lines in Canada and lighting products in the U.S."

17.     Genera's products include automotive lamps and performance lamps.  Genera states on its website the following with respect to its aftermarket products manufactured by defendant TYC:  "TYC offers the world's most comprehensive automotive replacement lighting products available, ranging from domestic to import applications, from passenger cars to SUVs."

18.     Genera's performance lamp products currently include tail lamps, backup lamps, and headlamps, in multiple colors and paintable, for numerous makes and models of vehicles, including Acura; Chrysler; Chevrolet; Dodge; Ford; GMC; Honda; Lincoln; Mercury; Mitsubishi; Nissan; Pontiac; Saturn; Subaru; Toyota; and Volkswagen.  Genera lamps are listed as including the following functionalities: tail; stop; turn signal; side marker, backup, and reflex.  Genera provides detailed testing reports via its performance lamp website that document

- 5 -
CONSOLIDATED CLASS ACTION
COMPLAINT

compliance with the photometric requirements of the U.S. Federal Motor Vehicle Safety Standard (FMVSS). Genera notes on its performance lamp website that "[w]e currently do not sell Elegante by TYC lamps to the public so all purchases must be through an authorized dealer, whether online or retail location." During the Class Period, Genera sold Aftermarket Automotive Lighting Products to Class members in the United States.

**The Depo Defendants**

19. Defendant Depo Auto Parts Ind. Co., Ltd. ("Depo") is a corporation organized and existing under the laws of Taiwan with its principal place of business located at 20-3, Nan Shih Lane, Lu Kang, Chang-Hwa Hsien, Taiwan 638. Depo is a leading manufacturer of Aftermarket Automotive Lighting Products which it manufactures in Taiwan and exports for sale around the world, including the United States. Depo was formed in 1977 as Ming Yang Corp., and in 2002 was renamed Depo Auto Parts Ind. Co., Ltd. In 2004, it was estimated that Depo accounted for about 35% of the American aftermarket lamp market, trailing only defendant TYC. In 2004, Depo became a publicly-traded company on the Taiwan Stock Exchange. Depo develops, manufactures, and distributes replacement lamps for vehicles under its "Depo" and "Lucid" brands. During the Class Period, Depo sold Aftermarket Automotive Lighting Products to Class members in the United States.

20. Defendant Maxzone Vehicle Lighting Corp. ("Maxzone") is a corporation organized and existing under the laws of the State of California with its principal place of business located at 11016 Mulberry Avenue, Suite B, Fontana, California 92337. Maxzone imports, distributes and sells throughout the United States Aftermarket Automotive Lighting Products imported from Taiwan. Maxzone is a wholly or partially owned subsidiary of defendant Depo and was formed by Depo in 1997 to be its sole and exclusive United States distributor. Maxzone's website states that "[a]ll our automotive lamp products are designed, developed and produced by our parent company, DEPO Auto Parts Corp, a world class manufacturer of automotive replacement lamps . . . DEPO has Maxzone to take care of North America distribution and [the] Taipei business office to take responsibility for the sale of Europe, Africa, South America and Australia area." Maxzone's website states that "[i]n addition

- 6 -

[to] our aftermarket auto lamps, our product lines include OEM lamps, performance lamps, window regulator and door handle." Maxzone's products include replacement lights and performance lights. Maxzone has four distribution centers, located in: Elmwood Park, NJ; Atlanta, GA; Elgin, IL; and Etobicoke (Toronto), Canada. Maxzone's website further notes that it "only sells wholesale." During the Class Period, Maxzone sold Aftermarket Automotive Lighting Products to Class members in the United States.

**The Eagle Eyes Defendants**

21.     Defendant Eagle Eyes Traffic Ind. Co. Ltd. ("Eagle Eyes") is a corporation organized and existing under the laws of Taiwan with its principal place of business located at No. 27 Lane 764 Chung Shan N. Rd., Yung Kang City, Taiwan Hsien, Taiwan. Eagle Eyes is a manufacturer of Aftermarket Automotive Lighting Products which it manufactures in Taiwan and exports for sale around the world, including the United States. Eagle Eyes was formed in 1979, and its website states that it "devotes itself to the production of high quality automotive lamps, both spare and performance. We serve global AM customers in nearly 100 countries. This ISO 9001 : 2000 certified cooperation [*sic*] is confident with its ability to provide safety and fulfillment to its customer consistently. In addition to our qualified spare products, we also design and produce stylish performance lamps which make us one of the leading performance lamp suppliers around the world." Eagle Eyes' products include replacement auto lamps and performance lamps, including rear lamps, head lamps, signal lamps, fog lamps, park lamps, side marker lamps, and corner lamps for numerous makes and models of vehicles. During the Class Period, Eagle Eyes sold Aftermarket Automotive Lighting Products to class members in the United States.

22.     Defendant E-Lite Automotive Inc. ("E-Lite") is a corporation duly organized and existing under the laws of the State of California with its principal place of business located at 14401 Monte Vista Avenue, Chino, California 91708. E-Lite imports, distributes and sells, throughout the United States, Aftermarket Automotive Lighting Products imported from Taiwan. E-Lite is a wholly or partially owned subsidiary of defendant Eagle Eyes and was formed by Eagle Eyes in 2006 to be its sole and exclusive United States distributor. E-Lite's website states

that "E-Lite U.S.A. Automotive, a partner of Eagle Eyes Corporation, was founded in 2006" and that "[a]ll of our lamps are made by Eagle Eyes Corporation" and that "[w]e specialize in headlights, taillights, corner lights, parking lights, and fog lights in the aftermarket lamps market," and that "E-Lite produces a wide array of lamps intended for use in all major North American car manufacturers' products." During the Class Period, E-Lite sold Aftermarket Automotive Lighting Products to class members in the United States.

23.    Defendants TYC, Genera, Depo, Maxzone, Eagle Eyes, and E-Lite are collectively referred to herein as "Defendants." Defendants TYC, Depo, and Eagle Eyes are collectively referred to herein as "Manufacturer Defendants." Defendants Genera, Maxzone, and E-Lite are collectively referred to herein as "Distributor Defendants."

24.    Whenever in this Complaint reference is made to any act, deed or transaction of any corporation, the allegation means that the corporation engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

25.    All acts alleged in this Complaint to have been done by Defendants were performed by their officers, directors, agents, employees or representatives while engaged in the management, direction, control or transaction of Defendants' business affairs.

**CO-CONSPIRATORS**

26.    On information and belief, various other companies and individuals, not named as Defendants in this Complaint, may have participated as co-conspirators in the acts complained of herein, and performed acts and made statements in furtherance of such conspiracy, including, but not limited to, Tong Yang Industrial Co., Ltd. ("Tong Yang"), TYG Products, L.P., Gordon Auto Body Parts Co., Ltd. and YCC Parts Manufacturing, Inc.

**TRADE AND COMMERCE**

27.    With over 225 million vehicles in the United States, the automotive aftermarket industry is substantial. Sales of aftermarket automotive products in the United States exceeded $285 billion in 2007.

28.     The percentage of the entire aftermarket automotive products that is made up of lighting products represents a significant amount of commerce, with approximately $450 million sales in the United States in 2005, with projected growth to approximately $515 million by 2010.

## CHARACTERISTICS OF THE  MARKET FOR AFTERMARKET AUTOMOTIVE LIGHTING PRODUCTS THAT FACILITATE COLLUSION

### Market Concentration

29.     As the demand for automotive repair parts grew in the 1950's and 1960's, non-OEM parts manufacturers entered the market where independent mechanics, but not dealers, purchased the parts.  This is referred to as an aftermarket.  An aftermarket is the market for replacement and supplementary parts and/or repair services for a product that the buyer has previously acquired, or for products consumed through the use of the original product. Aftermarket Automotive Lighting Products constitute a market distinct from lighting products supplied by third parties to vehicle manufacturers for incorporation into new vehicles, and also distinct from the market for original equipment replacement parts made by the manufacturers of automobiles, or for those manufacturers by third parties.  There is a significant difference in the wholesale price, often as large as 50%, between an OEM product and a comparable aftermarket product.  In addition, most insurance carriers who supply coverage for automobile collisions require automotive body shops to purchase and use aftermarket products on repairs paid for by the insurance carriers.  Accordingly, aftermarket products and products of original equipment manufacturers are not reasonably interchangeable substitutes from the point of view of the purchaser and are not in direct and substantial competition with each other.

30.     Aftermarket prices are cheaper than OEM prices because aftermarket companies specialize in such products and tend to redesign and make more cost efficient changes as compared to the OEM product, resulting in cheaper prices.

31.     Aftermarket Automotive Lighting Products includes parts most often replaced following collisions, which have the same specifications as OEM parts but are often sold without automaker certification.

32.     Collectively, the products of the Manufacturer Defendants comprise the vast majority (90%) of all Aftermarket Automotive Lighting Products sold in the United States, and as a consequence, their Distributor Defendant affiliates also control the vast majority (over 90%) of the Aftermarket Automotive Lighting Product market in the United States.

33.     Aftermarket Automotive Lighting Products are highly fungible.  Purchasers decide on a product, and competitors compete for purchasers, largely based on price.  There are no other substitutable products for Aftermarket Automotive Lighting Products.  Price fixing and market allocation are particularly pernicious within a highly concentrated, fungible market for which adequate substitutes do not exist, as is the case here.  One example of the fungibility of the products in this market is Genera's "TYC Part Interchange" feature on its website, where users can input a "Part Interchange Query" by selecting a "Competitor Number" and then receive information about an equivalent, and interchangeable part.

34.     Typically, when an order is placed with a plaintiff for an Aftermarket Auto Lighting Product, a brand is not specified.  For example, when a customer, such as an autobody repair shop, requests a tail lamp for a 2000 Jeep Cherokee, the customer does not request a certain manufacturer or care whether the lamp comes from TYC, Depo or Eagle Eyes.

**Barriers To Entry**

35.     There are significant barriers to entry in the market for Aftermarket Automotive Lighting Products that have facilitated Defendants' collusion as described herein.  These include substantial research and development costs, and the development and maintenance of a robust distribution system.  Two other barriers of importance are: (a) the need to obtain various quality certifications for aftermarket products, and (b) the collusive business setting in which manufacturers of aftermarket automotive parts in Taiwan, including the Manufacturer Defendants, operate.

**Effects of CAPA Certification Program on the Market**

36.     The Certified Automotive Parts Association ("CAPA") is a non-profit organization established to develop and oversee a test program guaranteeing the suitability and quality of automotive parts.  Its website states "CAPA encourages competition in the marketplace in the

CONSOLIDATED CLASS ACTION
COMPLAINT

hope that their program will ultimately reduce expense to the consumer and the industry while increasing and assuring part quality." In fact, Defendants' participation in CAPA certification facilitated the maintenance of the illegal price-fixing scheme described herein, as it created further barriers to entry and limited competition. The Manufacturer Defendants are all participating manufacturers in the CAPA certification program.

37. By way of background regarding quality certification, an Illinois class action against the State Farm insurance company, commenced in 1997, had a dramatic effect on the market for aftermarket automotive parts. In that case, the plaintiffs accused State Farm, the largest automobile insurer in the United States, of breaching its contracts with policyholders when it specified the use of non-original equipment parts in the repair of vehicles damaged in crashes. In 1999, a jury awarded $456 million to the plaintiffs, and the presiding judge awarded an additional $730 million, including $600 million in punitive damages. In the wake of these combined awards in excess of $1 billion, the North American market for aftermarket parts dropped by about 40% in 2000, resulting in challenging times for almost all Taiwan aftermarket parts suppliers during the following two to three years. In 2005, the Illinois Supreme Court eventually reversed all awards made against State Farm, and in 2006, the United States Supreme Court declined to hear plaintiffs' appeal.

38. Following the United State Supreme Court's decision to not hear an appeal in the *State Farm* case, and State Farm's expected decision to once again utilize aftermarket parts, Taiwan news reports in 2006 quoted local aftermarket parts makers as predicting a return to sales levels even higher than in 1999.

39. The impact of the *State Farm* case had begun to soften in 2002, as a group of United States auto insurance firms (not including State Farm) resumed the use of aftermarket parts. By mid-2006, the aftermarket parts market recovered to, or even exceeded, the pre-1999 levels.

40. The *State Farm* case jump-started a move by Taiwanese aftermarket parts makers in 2000 to join quality-control organizations such as CAPA, and to actively increase the number of their CAPA-approved items available to the auto-insurance market. Several years later,

- 11 -

CONSOLIDATED CLASS ACTION COMPLAINT

1   CAPA decided to add a quality certification program for lighting products, which it previously

2   did not offer.

3          41.     Defendant Genera, the exclusive U.S. distributor for defendant TYC, states on its

4   website the following regarding CAPA certification:

5

6          CAPA created standards for the objective evaluation and certification of sheet

7          metal, bumper, and other automotive collision replacement parts.

8

9          Because exterior lighting products represent about one-quarter of the total cost of

10         replacement parts used in collision repair, CAPA has developed a quality

11         certification program for lighting products. In September, 2005, TYC, through

12         extensive collaboration with CAPA, became the first manufacturer to achieve

13         CAPA certification of lighting parts.

14

15         CAPA certified TYC lighting products are of OE-comparable form (appearance),

16         fit (installation), and function (performance), are highly regarded as a viable

17         alternative quality part, and are quickly gaining awareness and enthusiastic

18         acceptance by collision repairers.

19

20         Approximately 7 out of 10 national auto insurance companies prescribe CAPA

21         parts, many of whom are prescribing CAPA certified lamps.  TYC's CAPA

22         certified lamps create repair opportunities that previously did not exist by driving

23         more business to repairers and substantially reducing the percentage of vehicles

24         declared total-loss in a collision repair estimate.

25

26         TYC offers the broadest CAPA certified lighting products in the market and is

27         consistently developing popular applications, with internal testing labs that

28         accelerate release timing of new items. Our aggressive production inventory

planning ensures the highest fill rate and ability to meet growing demand via our five strategically located distribution centers throughout the U.S.

42.     Depo also joined the CAPA certification in 2005, and by the end of that year, Depo owned 18 CAPA certified lamp sets, and TYC owned 3.  TYC planned to own 150 to 2000 certified lamp sets by the end of 2006.  A Taiwanese news account in 2006 noted that CAPA's decision was expected to increase the confidence of policyholders in the use of AM parts to repair their vehicles, gradually squeeze low-quality parts from the market, improve the quality of certified parts, and enhance the profit margins of manufacturers in Taiwan.

43.     In 2006, Michael Hu, Depo's sales manager, was quoted as stating that "[t]he sale of AM auto lamps in the U.S. was growing steadily even before the CAPA decision to provide certification for automotive lighting products.  Now, we see even greater growth momentum ahead.  The more lamp models that are certified, the stronger the growth momentum will be because insurance companies will have more choices of parts."  Mr. Hu went on to contrast the more competitive European market with the less-competitive U.S. market as follows:  "[In Europe], competition for Taiwanese suppliers is much fiercer than it is in the U.S., because all OE auto-lamp suppliers there also supply the original equipment service (OES) market where replacement parts are distributed under the brand names of the automakers themselves and through their own maintenance networks."

44.     Also in 2006, TYC's director of aftermarket and OEM sales, Carlos Ting, was quoted as stating that "CAPA certification will bring a better market in North America for quality-oriented auto-lamp suppliers like TYC because poor-quality products have destroyed the *market order* there in the past few years." (Emphasis added).

45.     In 2006, TYC's manager of North American sales, Orian Chang, was quoted as stating that "CAPA certification is a challenge for all auto-lamp makers because it requires even higher levels of quality and safety than is required for OEM items.  CAPA approval will create lucrative business opportunities for the companies that can qualify."  Not surprisingly, TYC's global sales grew by 10% to 20% in the first half of 2006, depending on market area, and Mr.

Ting attributed the substantial sales growth in part to TYC's increasing number of CAPA-certified products.

46.     Other certification programs existed for Aftermarket lamps.  For example, the Manufacturers' Qualification and Validation Program ("MQVP") certified the quality and safety of some non-OEM parts.   The program outlined policies and quality-management practices designed to ensure that repair parts are equal to original parts in form, function, and durability. In 2003, it was reported that defendant TYC claimed to have the highest ratio of MQVP-certified products among all the world's auto-parts makers.  That year, Nationwide Mutual Insurance Co., the sixth largest insurer in the U.S., approved the use of TYC aftermarket lamps as replacement parts following certification of those lamps by the MQVP.

47.     It was also reported in 2003 that another development that encouraged the use of non-OE parts is the differential-premium system offered by insurance companies in the U.S., allowing policyholders to opt for lower premiums if they accepted the use of non-OEM parts to repair their insured cars.

**Cooperation Among Taiwanese Aftermarket Auto Parts Manufacturers**

48.     As *Taiwan Economic News* noted in 2003, Taiwan has an unmatched advantage of a well-established industry cluster in the southern part of the island, and had become the biggest and most important production base for aftermarket auto parts in the world.  Raymond Wu, president of Tong Yang, analyzed the Taiwanese aftermarket parts manufacturers as follows:

> Now the world's strongest AM auto-parts production citadel, according to Wu,
> Taiwan comes close to monopolizing the global AM parts market and is largely
> able to escape any negative impact from foreign-exchange fluctuations because
> almost all major makers in the AM sector are from Taiwan and thus their
> quotation bases move in tandem, providing strong pricing power.
>
> Wu points out that most local major makers of AM auto parts in southern
> Taiwan's industry cluster have similar backgrounds. Their founding personnel
> were previously with traditional makers in the auto sector. They were focused on

export sales right from the early years. They gradually expanded production scale with increased global demand, constantly upgrading their production techniques and finished-product quality, constantly accelerating and strengthening their product-development capabilities, and have also become engaged in OE parts supply to international automakers after gaining a solid foothold in the AM market. After about 30 years of strenuous efforts, Wu says, many small companies in and around the southern Taiwan city of Tainan have grown to become major international OE/AM parts suppliers . . .

According to Wu, the Taiwan auto-parts industry's global competitiveness lies mainly in makers' one-stop-shop service capability, which has been put in place as a result of intensive investments in mold/die development and new-product development, high-level management and quality control, and a deep cluster of makers of items in wide variety.

Taiwan's AM-parts industry is also now implementing a more sophisticated international marketing strategy, moving away from exclusive reliance on low prices to attract customers. In the past, Wu explains, most local AM-parts makers competed with one another by cutting prices no matter how strong the global demand was, to "steal" market share from each other, but now the situation has changed, makers have abandoned this approach, and the profit margins of major local AM-parts makers parallel or even outstrip those of high-tech product makers on the island.

One of the best examples is Taiwan Kai Yih Industrial Co., Ltd., an affiliate of Tong Yang and one of the island's major AM sheet-metal body-parts makers. Kai Yih is a relative newcomer among major counterparts in Taiwan but the company skillfully utilizes Tong Yang Group's resources and advantages in

mold/die development and closely cooperates with local counterparts to escape the blood-shedding price competition, thus achieving very high profitability, Wu explains.

. . .

The Tong Yang Group is one of the best examples--and one of the creators--of the Taiwan auto-parts industry cluster. Tong Yang started over 50 years ago by concentrating on the plastic-injection parts-production business. After various transformations undertaken in the early stages, the group decided to concentrate on transportation vehicle-relevant parts production and constantly evolved from a maker of plastic bicycle parts, motorcycle windshields to plastic auto "crash parts"--replacement parts for use after car collisions as bumpers, grills, mirrors, etc. Now, Tong Yang is one of the largest auto parts conglomerates in Taiwan and also a leading supplier of both OE and AM auto parts in the international market.

49.   Another 2003 article in the *Taiwan Economic News* described  an anticompetitive market division arrangement between the Ta Yih Group (which includes TYC) and Tong Yang:

Wu Jun-ji, chairman of Ta Yih Group, was with Tong Yang earlier in his career before he stepped out of the group to set up one of the island's first motorcycle and auto-lamp factories. *With close ties with Tong Yang, Wu Jun-ji insists that all of the affiliates in the Ta Yih Group only produce items that Tong Yang does not, to escape destructive in-group competition. With this tacit understanding between Ta Yih and Tong Yang*, Wu Jun-ji says, the two groups cooperate closely in joint market development by sharing marketing expenses and together offering a more comprehensive product line (emphasis added).

50.  The ties between Defendants, as well as Ta Yih Industrial Co., Ltd., the OEM lighting manufacturer that is another member of the Ta Yih Group along with defendant TYC, are strong.  For example, the *Taiwan Economic News* reported that a "cooperative arrangement, the Advanced Auto-lamp System R&D Alliance (ALS), was formed in 2004 to upgrade the

- 16 -

CONSOLIDATED CLASS ACTION
COMPLAINT

global competitiveness of the island's auto lamps by focusing on the original-equipment (OE) business," and its 11 members were listed as including Ta Yih Industry, TYC, and Depo, Taiwan's top-three auto-lamp makers.

### DEFENDANTS' ANTITRUST VIOLATIONS

51.   Defendants are horizontal competitors at the manufacturing and distributor levels, respectively, and collectively conspired to fix the prices of and artificially manipulate the market for the importation, sale and distribution throughout the United States of Aftermarket Automotive Lighting Products.  Each of the Distributor Defendants is the exclusive distributor of Aftermarket Automotive Lighting Products made by a specific Manufacturer Defendant located in Taiwan.  Defendant Genera is wholly or partially owned by and is the exclusive importer and seller of the lighting products made by defendant TYC; defendant Maxzone is wholly or partially owned by and is the exclusive importer and seller of the lighting products of defendant Depo; and defendant E-Lite is wholly or partially owned by and is the exclusive importer and seller of the lighting products of defendant Eagle Eyes.

52.   Beginning at least as early as January 1, 2004 and continuing up to the present, Defendants and their co-conspirators combined and conspired to unreasonably restrain competition in interstate commerce in the importation, sale and distribution of aftermarket automotive lighting products in the United States, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

53.   The purpose and effect of Defendants' price fixing conspiracy has been to eliminate competition among and between themselves and to eliminate customer choice by establishing artificially high and noncompetitive prices for Aftermarket Automotive Lighting in the United States.  This price fixing agreement constitutes a *per se* violation of Section 1 of the Sherman Act (15 U.S.C. § 1) in that it eliminates competition and customer choice.

54.   From at least January 1, 2004 through the present, Defendants engaged in extensive price fixing of Aftermarket Automotive Lighting Products.  Defendants' unlawful conspiracy had the effect of, among other things, raising prices of those products and eliminating

competitors from the market, thereby further restraining trade in the importation, distribution and sale of aftermarket automotive lights throughout the United States.

55.     The Defendants also employed anticompetitive tactics to eliminate distributors who refused to participate in Defendants' price fixing scheme and others who posed a competitive threat.  The effect of Defendants' anticompetitive conduct has been to reduce the number of competitors selling the relevant products to Plaintiff and the Class.

56.     On September 3, 2008, a former distributor for Eagle Eyes filed an individual complaint alleging, based on first-hand knowledge, that Defendants met and conspired to fix prices of aftermarket automotive lighting products.  The same former distributor specifically identified by name the executives and managers from Defendants who participated in meetings with their horizontal competitors to fix prices, as well as the locations where price-fixing meetings took place.

57.     Starting at least as early as 2004, the representatives of the Manufacturer Defendants met in Taiwan to fix the prices at which each manufacturer would sell to its distributors in the United States and then the United States Distributor Defendants separately met, including at the offices of defendant Genera in La Palma, California and at the Automotive Aftermarket Products Expo ("AAPEX"), an industry trade show in Las Vegas, Nevada, to conspire to fix prices of Aftermarket Automotive Lighting Products.  Defendants met at the AAPEX in November, 2004; November, 2005; October, 2006; and October 2007, in furtherance of their anticompetitive conspiracy.

58.      Defendants further facilitated their conspiracy by, *inter alia*, using international trade shows as convenient forums to conspire. One such example is the International Auto Parts & Accessories Show, the most recent of which was held in Taipei over four days in April of 2008.

59.     Defendants agreed to fix the prices at which they would sell to their respective customers.   At the Distributor Defendants' meetings, there was open discussion of the Manufacturer Defendants' meetings in Taiwan and the prices reached at those meetings.  The

Manufacturer Defendants' meetings in Taiwan were attended by the following Manufacturer Defendants through their representatives indicated below:

| TYC | Chun-Chi Wu (Chairman/General Manager) |
| Depo | Shiu-Min Hsu (Chairman) and Jui-Hua Lai (General Manager) |
| Eagle Eyes | Yu-Chu Lin (Chairman); Ching-Tsung Lai (General Manager); Homy Hsu (Vice President) |

60.   Since 2007, the Distributor Defendants' meetings in California and Nevada were attended by the following Distributor Defendants through the representatives indicated below:

| E-Lite | George Lee (President) and Shih Chi (Gary) Lin (Eagle Eyes' owner's son) |
| Genera | Drue Hsia (President) and Jackson Kwok (Executive Vice President) |
| Maxzone | Polo Shu Sheng Hsu (President) and Galen Chen (Director of Sales and Marketing) |

61.   At meetings between employees of the Distributor Defendants, and possibly others, said employees represented that their United States resale prices were fixed by their respective Manufacturer Defendants and were graduated (not precisely equal) so as to reflect the market share or consumer preferences for brand.   Accordingly, the prices set for Genera, perceived to be the premier aftermarket product, were 2-3% higher than for Depo and, in turn, Depo's prices were 5-7% higher than Eagle Eyes.

62.   In December of 2003, just before the onset of the conspiracy period alleged herein, defendant TYC reported pretax earnings of US $19.3 million for the first 11 months of 2003, down 24% from the same period in the 2002.   *Taiwan Economic News* reported that TYC attributed its decreased 2003 profits to, among other things, the fact that "some local auto lamp makers were engaged in fierce price-cutting competition with the firm in overseas markets, which also undermined [the] company's profitability."

63.     The price-cutting competition in "overseas markets," and in particular, the U.S. market, was remedied by Defendants' adherence to the collusive price-fixing conspiracy alleged herein.  Its effects were immediate and substantial.  On August 13, 2004, *Taiwan Economic News* reported that defendant TYC had July 2004 revenue of US $17.43 million, up 13.4% from the same month in 2003, and its seven-month revenue reached US $114.94 million, up 2.5% from the same period of the prior year.  Both figures were record highs.  *Taiwan Economic News* reported that "TYC attributed the brilliant operation results" to "price hikes for its products," among other things.

64.     Depo too enjoyed the results of collusion.  Baring Private Equity Partners Asia ("Baring Asia"), owner of a stake in Depo, noted in 2004 that Depo was the most profitable auto parts company in Taiwan, generating over US $150 million in sales, with US $29 million of net profit.  Baring Asia further noted that "Depo has a dominant market position in an industry which is experiencing strong demand in the US and Europe."  Jean Eric Salata, Managing Partner of Baring Asia, was quoted with respect to defendant Depo as stating that "[t]his is a solid company with very high entry barriers."

65.     Defendant Eagle Eyes has also benefited from its role in the conspiracy.  The company is based in Tainan, as is TYC, and the collusive business environment pervading the aftermarket auto parts manufacturers in that region is described earlier in this Complaint.  The *Taipei Times* reported in 2007 that Eagle Eye was selected by the China Credit Information Service as a prime example of Taiwan's booming businesses, and reported annual revenues of more than US $24.4 million.

66.     The effects of Defendants' collusive scheme continue to this day.  In April of 2008, representatives of defendants TYC and Depo attended the four-day 2008 International Auto Parts and Accessories Show in Taipei, and the *Taipei Times* reported that both companies commented at the event on very substantial price increases as follows:

> DEPO has gradually adjusted its prices by between 10 percent and 15 percent
>
> since the first quarter of this year," said Tony Wang, section chief of DEPO's
>
> Middle East Africa area, on the sidelines of the 2008 International Auto Parts

CONSOLIDATED CLASS ACTION
COMPLAINT

1   and Accessories Show (AMPA) in Taipei.   Another major Taiwanese major

2   automotive lighting equipment manufacturer, TYC Brother Industrial Co,

3   agreed.   Eldon Lin, assistant general manager of TYC's aftermarket sales

4   department, said the company would have to increase 10 percent of its sales to

5   cover the rising costs of raw materials, primarily cardboards and plastics.

6   67.   Defendants' statements also are notable in that they sought to attribute on a

7   pretextual basis the entirety of their price increases solely to rising material costs, *i.e.*, cardboard

8   and plastic costs; transportation costs related to rises in crude oil prices; and currency

9   fluctuations, while failing to disclose the impact of the illegal conspiracy on prices.

10   68.   At the request of the United States Department of Justice, a federal grand jury was

11   empanelled in the Northern District of California to investigate possible criminal antitrust

12   violations with respect to Aftermarket Automotive Lighting Products, and has intervened in this

13   civil antitrust case.

14   69.   The present suit is not the first time that various Defendants and co-conspirators

15   have been alleged to have collectively violated United States trade laws.   In 2006, in *In the*

16   *Matter of Certain Automotive Parts*, United States International Trade Commission ("U.S.

17   I.T.C.") Investigation No. 337-TA-557, the presiding Administrative Law Judge issued a

18   decision holding that various entities, including defendants TYC and Depo, and co-conspirators

19   Gordon and YCC, violated section 337 of the Tariff Act of 1930 (19 U.S.C. § 1337), by

20   importing into the United States and selling various automotive parts, including headlamps, that

21   infringed patents held by a subsidiary of Ford Motor Company ("Ford").   The U.S. I.T.C.

22   declined to review the decision.   On May 2, 2008, in another U.S. I.T.C. proceeding, captioned

23   *In the Matter of Certain Automotive Parts*, Investigation No. 337-TA-651, a Ford subsidiary

24   filed a similar claim related to parts for the 2005 Ford Mustang, and the entities Ford named as

25   respondents included defendant TYC , co-conspirator YCC, and co-conspirator TYG Products,

26   L.P.

27

28

CONSOLIDATED CLASS ACTION
COMPLAINT

## ANTICOMPETITIVE EFFECTS OF VIOLATION ON PLAINTIFF

## AND THE CLASS

70.     The conduct of Defendants described in this Complaint has produced antitrust injury, and unless restrained, will continue to produce the following anticompetitive effects, among others:

(a)     competition in the importation, distribution and sale of Aftermarket Automotive Lighting Products in the United States has been and continues to be substantially and unreasonably restricted, lessened, foreclosed and eliminated;

(b)     barriers to entry into the production, distribution and sale of Aftermarket Automotive Lighting Products in the United States have been raised;

(c)     prices for customers seeking Aftermarket Automotive Lighting Products in the United States have risen and will continue to do so;

(d)     customers seeking Aftermarket Automotive Lighting Products in the United States are, and will be, deprived of choice with respect to price and vendor/manufacturer; and

(e)     the importation, distribution and sale of Aftermarket Automotive Lighting Products in the United States will continue to be artificially restrained.

## EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

71.     Throughout the Class Period, Defendants and their co-conspirators affirmatively and fraudulently concealed their unlawful conduct.

72.     Neither Defendants nor their co-conspirators told Plaintiffs or other Class members that they were fixing prices or allocating markets.  Accordingly, Plaintiffs and Class members could not have discovered the violations alleged herein earlier until shortly before the filing of the first Complaint in the actions comprising this litigation because Defendants and their co-conspirators conducted their conspiracy secretly, concealed the nature of their unlawful conduct and acts in furtherance thereof, and fraudulently concealed their activities through various other means and methods designed to avoid detection.

73.     Defendants and their co-conspirators engaged in a successful price-fixing conspiracy, which they affirmatively concealed by, *inter alia*: (a) meeting secretly to discuss prices, customers and markets of Aftermarket Automotive Lighting Products sold in the United States and elsewhere; (b) using methods of communication in furtherance of the alleged conspiracy that were designed to avoid detection; (c) giving pretextual reasons for price increases on Aftermarket Automotive Lighting Products, as in the April 2008 example noted above; and (d) agreeing among themselves at meetings and in communications not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal scheme.

74.     As a result of Defendants and their co-conspirators' fraudulent concealment, all applicable statutes of limitations affecting the Plaintiffs' and the Class's claims have been tolled. Plaintiffs and the Class members did not discover, nor could have discovered through reasonable diligence, that Defendants and their co-conspirators were violating the antitrust laws until September 2008, when a lawsuit was filed by a distributor that revealed details of Defendants' unlawful and collusive scheme. Plaintiffs could not have discovered the existence of the combination and conspiracy alleged herein at an earlier date by the exercise of reasonable due diligence because of the deceptive practices and techniques of secrecy employed by the Defendants and their co-conspirators to avoid detection and affirmatively conceal such violations.

75.     Because the contract, combination, or conspiracy was kept secret by the defendants, Plaintiffs were unaware of the fact that prices of Aftermarket Automotive Lighting Products were secretly raised, fixed, maintained or stabilized as alleged herein.

76.     As a result of the fraudulent concealment of the conspiracy, Plaintiffs assert the tolling of the applicable statute of limitations affecting the causes of action by Plaintiffs and the members of the Class.

**CLASS ACTION ALLEGATIONS**

77.     Plaintiffs bring this action on behalf of themselves and as a class action under the provisions of Rule 23(a) and (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following Class:

> All persons and entities that purchased Aftermarket Automotive Lighting Products in the United States, and its territories and possessions, directly from a Defendant between at least as early as January 1, 2004 and the present (the "Class Period").  This class excludes any judicial officer who is assigned to hear any aspect of this action, governmental entities, Defendants, co-conspirators, and the present and former parents, predecessors, subsidiaries and affiliates of the foregoing.

78.     Plaintiffs believe that there are at least hundreds of Class members as above described, the exact number and their identities being known by Defendants, making the Class so numerous and geographically dispersed that joinder of all members in impracticable.

79.     There are questions of law and fact common to the Class, which questions relate to the existence of the conspiracy alleged, and the type and common pattern of injury sustained as a result thereof, including, but not limited to:

(a)     Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain and/or stabilize prices of Aftermarket Automotive Lighting Products and/or engaged in market allocation for those products sold in the United States, and its territories and possessions.

(b)     The identity of the participants in the conspiracy;

(c)     The duration of the conspiracy alleged in this Complaint and the nature and character of the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)     Whether the alleged conspiracy violated Section 1 of the Sherman Act;

(e)     Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business and property of Plaintiffs and other members

of the Class;

(f)     The effect of Defendants' conspiracy on the prices of Aftermarket Automotive Lighting Products sold in the United States and its territories and possessions during the Class Period; and

(g)     The appropriate measure of damages sustained by Plaintiffs and other members of the Class.

80.     Plaintiffs are direct purchasers of Aftermarket Automotive Lighting Products and their interests are coincident with and not antagonistic to those of the other members of the Class.  Plaintiffs are members of the Class, have claims that are typical of the claims of the Class members, and will fairly and adequately protect the interests of the members of the Class.  In addition, Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

81.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications.

82.     Defendants have acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

83.     The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

84.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently and without duplication of effort and expense that numerous individual actions would engender.  The Class is readily definable and is one for which records should exist in the files of Defendants and their co-conspirators, and prosecution as a class action will eliminate the possibility of repetitive litigation.  Class treatment will also permit the adjudication of relatively small claims by many Class members who otherwise could not afford to litigate an antitrust

1   claim such as is asserted in this Complaint.   This class action presents no difficulties of

2   management that would preclude its maintenance as a class action.

3                                          **CAUSE OF ACTION**

4                       **(Violation of Section 1 of the Sherman Act – 15 U.S.C. § 1)**

5          85.   Plaintiffs incorporate and re-allege each allegation set forth in the preceding

6   paragraphs of this Complaint.

7          86.   Beginning at least as early as January 1, 2004, and continuing thereafter,

8   Defendants and their co-conspirators, by and through their officers, directors, employees, agents,

9   or other representatives, entered into a continuing agreement, understanding, and conspiracy in

10  restraint of trade to artificially raise, fix, maintain, and/or stabilize prices for Aftermarket

11  Automotive Lighting Products in the United States, and its territories and possessions, in

12  violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

13         87.   The contract, combination and conspiracy consisted of a continuing agreement,

14  understanding and concert of action among the Defendants and their co-conspirators, the

15  substantial terms of which were to fix, raise and maintain, or stabilize prices for Aftermarket

16  Automotive Lighting Products and/or engage in market allocation for those services in the

17  United States, its territories and possessions.

18         88.   In formulating and effectuating the contract, combination or conspiracy,

19  Defendants and their co-conspirators unlawfully combined and conspired to, among other acts:

20              (a)    agree to charge prices at certain levels and otherwise to fix, increase,

21      maintain and/or stabilize prices of Aftermarket Automotive Lighting Products and/or

22      allocate the market;

23              (b)    exchange information on prices and sales volumes;

24              (c)    implement and monitor the conspiracy among cartel members;

25              (d)    market Aftermarket Automotive Lighting Products as being available at the

26      agreed upon prices; and

27              (e)    sell Aftermarket Automotive Lighting Products at the agreed-upon prices.

28

89.     The activities described above have been engaged in by Defendants and their co-conspirators for the purpose of effectuating the unlawful agreements to fix, maintain, raise and/or stabilize prices of Aftermarket Automotive Lighting Products and/or allocate the market for those products.

90.     The conspiracy had its intended effect, as Defendants benefited from their collusively-set price raises, including in 2008, as described herein.

91.     Defendants' unlawful conduct resulted in artificially high prices charged by Defendants and their co-conspirators to Plaintiffs and the members of the Class for Aftermarket Automotive Lighting Products.

92.     Plaintiffs and members of the Class had to pay more for Aftermarket Automotive Lighting Products than they would have paid in a competitive marketplace.

93.     Plaintiffs seek to recover for these overcharge damages.

94.     As a direct and proximate result of Defendants' scheme, Plaintiffs and the members of the Class have been injured and financially damaged in their respective businesses and property, in amounts which are presently undetermined.  Plaintiffs' injuries consist of paying higher prices to purchase Aftermarket Automotive Lighting Products than they would have paid absent Defendants' conduct.  Plaintiffs' injuries are of the type the antitrust laws were designed to prevent and flow from that which makes Defendants' conduct unlawful.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray as follows:

A.      That the Court determines that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure.

B.      That the contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators, be adjudged to have been in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

C.      That judgment be entered for Plaintiffs and members of the Class against Defendants for three times the amount of damages sustained by Plaintiffs and the Class as allowed by law, together with the costs of this action, including reasonable attorneys' fees.

CONSOLIDATED CLASS ACTION
COMPLAINT

D.     That Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from, in any manner:

(1)     continuing, maintaining or renewing the contract, combination or conspiracy alleged herein, or from engaging in any other contract, combination or conspiracy having a similar purpose or effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect; and

(2)     communicating or causing a communication to any other person engaged in the manufacture, distribution or sale of any relevant product except to the extent necessary in connection with a bona fide sales transaction between the parties to such communications.

E.     That Plaintiffs and members of the Class have such other, further and different relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY DEMAND

Plaintiffs demand a jury trial, pursuant to Federal Rule of Civil Procedure 38(b), of all triable issues.

Dated: March 17, 2009                              Respectfully submitted,


By: _____/s/ Jason Hartley_____
            Jason S. Hartley

TROUTMAN SANDERS LLP
Jason S. Hartley
Jason M. Lindner
550 West B. Street, Suite 400
San Diego, California 92101
Telephone: (619) 235-4040
Facsimile: (619) 231-8796

COUGHLIN STOIA GELLER RUDMAN &
ROBBINS, LLP
Bonny Sweeney
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 231-1058
Facsimile: (619) 231-7423

HAUSFELD LLP
Michael P. Lehmann
Jon T. King
44 Montgomery Street, Suite 3400
San Francisco, CA 94104
Telephone: (415) 633-1908
Facsimile: (415) 358-4980

HAUSFELD LLP
Michael D. Hausfeld
1146 19th St. NW
Fifth Floor
Washington, D.C. 20036
Telephone: (202) 579-1089
Facsimile: (202) 747-5713

LABATON SUCHAROW LLP
Jay L. Himes
Hollis L. Salzman
Benjamin D. Bianco
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

*Plaintiffs' Interim Co-Lead Counsel*

HEINS MILLS & OLSON, P.L.C.
Vincent J. Esades
310 Clifton Ave
Minneapolis, MN  55403
Telephone: (612) 338-4605

MILBERG, LLP
Jeffrey Westerman
One California Plaza
300 South Grand Avenue, Suite 3900
Los Angeles, California 90071
Telephone: (213) 617-1200
Facsimile: (213) 617-1975

FIRM 1000506v8

CONSOLIDATED CLASS ACTION
COMPLAINT

GOLDMAN, SCARLATO & KARON, P.C.
Daniel Karon
55 Public Square
Suite 1500
Cleveland, OH 44113
Telephone: (216) 622-1851
Facsimile: (216) 622-1852

STEYER LOWENTHAL BOODROOKAS
ALVAREZ AND SMITH
Allan Steyer
One California Street, 3rd Fl.
San Francisco, CA 94111
Telephone:  415-421-3400
Facsimile:  415-421-2234

BOLOGNESE & ASSOCIATES
Anthony Bolognese
1500 JFK Boulevard, Suite 320
Philadelphia, PA 19102
Telephone:  215-814-6751
Facsimile:  215-814-6764

ZELLE HOFMANN VOELBEL MASON
AND GETTE
Craig C. Corbitt
Francis O. Scarpulla
Henry A. Cirillo
44 Montgomery Street, Ste. 3400
San Francisco, CA 94104
Telephone:  415-693-0700
Facsimile:  415-693-0770

FREED KANNER LONDON & MILLEN LLC
Douglas A. Millen
Steven A. Kanner
William H. London
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Telephone:  224-632-4500
Facsimile:  224-632-4519

KREINDLER & KREINDLER, LLP
Mark Labaton
707 Wilshire Boulevard
Los Angeles, CA 90067
Telephone: (213) 622-6469
Facsimile:  (213) 622-6469

- 30 -

CONSOLIDATED CLASS ACTION
COMPLAINT

1
2
3
4
5

COTCHETT, PITRE & McCARTHY
Joseph W. Cotchett
Niall P. McCarthy
Steven N. Williams
Mathew K. Edling
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577

6
7
8
9
10

KABATECK BROWN KELLNER LLP
Brian S. Kabateck
Richard L. Kellner
Michael V. Storti
644 South Figueroa Street
Los Angeles, California 90017
Telephone: (213) 217-5000
Facsimile: (213) 217-5010

11
12
13
14

KAPLAN FOX & KILSHEIMER LLP
Lori S. Brody
Justin B. Farar
1801 Century Park East, Suite 1420
Los Angeles, CA 90067
Telephone: (310) 785-0800
Facsimile: (310) 785-0893

15
16
17
18

KAPLAN FOX & KILSHEIMER LLP
Laurence D. King
Linda M. Fong
350 Sansome Street, Suite 400
San Francisco, CA 94104
Telephone: (415) 772-4700
Facsimile: (4151 772-4707

19
20
21

KAPLAN FOX & KILSHEIMER LLP
Robert N. Kaplan
850 Third Avenue, 14th Floor
New York, NY 10022
Telephone: (212) 687-1980
Facsimile: (212) 687-7714

22
23
24
25

McCARTHY & KELLY LLP
Gerald T. McCarthy
52 Duane Street - 7th Floor
New York, N.Y. 10007
Telephone: (212) 732-6000
Facsimile:  (212) 732-6323

26
27
28

- 31 -

CONSOLIDATED CLASS ACTION
COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

VICKERS, RIIS, MURRAY AND
  CURRAN, LLC
Steve Dampier
106 St. Francis Street, Suite 1100 (36602)
P.O. Drawer 2568
Mobile, AL 36652-2568
Telephone:  (251) 432-9772
Facsimile:  (251) 432-9781

GUSTAFSON GLUEK PLLC
Jason S Kilene
650 Northstar East Building
608 Second Avenue South
Minneapolis , MN 55402
Telephone:  (612) 333-8844
Facsimile:  (612) 339-6622

GLANCY BINKOW & GOLDBERG LLP
Susan G. Kupfer
One Embarcadero Center, Suite 760
San Francisco, CA  94111
Telephone:  (415) 972-8160
Facsimile:  (415) 972-8166

ROSENBERG, SHPALL &
  ASSOCIATES
Tomas Shpall
401 B Street Ste. 2209
San Diego, California 92101
Telephone:(619) 232-1826
Facsimile:  (619) 232-1859

CONSOLIDATED CLASS ACTION
COMPLAINT