1   ROBBINS GELLER RUDMAN
        & DOWD LLP
2   BONNY E. SWEENEY (176174)
    THOMAS R. MERRICK (177987)
3   PAULA M. ROACH (254142)
    655 West Broadway, Suite 1900
4   San Diego, CA 92101
    Telephone: 619/231-1058
5   619/231-7423 (fax)
    bonnys@rgrdlaw.com
6   tmerrick@rgrdlaw.com
    proach@rgrdlaw.com
7
    STUEVE SIEGEL HANSON, LLP
8   JASON S. HARTLEY (192514)
    JASON M. LINDNER (211451)
9   550 West C Street, Suite 610
    San Diego, CA 92101
10  Telephone: 619/400-5822
    619/400-5832 (fax)
11  hartley@stuevesiegel.com

12  Plaintiffs' Interim Co-Lead Counsel

13  [Additional counsel appear on signature page.]

14              UNITED STATES DISTRICT COURT

15             CENTRAL DISTRICT OF CALIFORNIA

16                    WESTERN DIVISION

17  In re AFTERMARKET AUTOMOTIVE  )  No. 2:09-ml-02007-GW(PJWx)
    LIGHTING PRODUCTS ANTITRUST   )
18  LITIGATION                    )  AMENDED CONSOLIDATED
                                  )  CLASS ACTION COMPLAINT
19

20                        [REDACTED]

21

22

23

24

25

26

27

28

571865_1

1.    Plaintiffs Dynacorn Autobody Parts, Inc., DJ's Autobody, Inc. d/b/a Wheeler's Autobody Supply, Prevatte Auto Supply, Inc., Motoring Parts International, Inc., and Sioux Plating Co. (collectively, "Plaintiffs") bring this action on their own behalf and on behalf of all those similarly situated to recover damages and obtain injunctive relief for Defendants' violations of the federal antitrust laws with respect to the fixing of prices for, and the allocation of customers for, aftermarket automotive lighting products, also known as AM lights and AM lamps ("Aftermarket Automotive Lighting Products"). Aftermarket Automotive Lighting Products are defined for purposes of this Amended Consolidated Class Action Complaint ("Amended Complaint") to include all aftermarket automotive lighting products sold by Defendants, including such products as headlamps and bulbs, parking, tail and interior lights, spot lights, fog lights and auxiliary lights, but excluding the products identified in Appendix A.

2.    Defendants' violations stem from their artificial manipulation of the market for Aftermarket Automotive Lighting Products. Plaintiffs demand a trial by jury. Plaintiffs allege on information and belief the following:

## JURISDICTION AND VENUE

3.    Plaintiffs bring this action under Sections 4 and 16 of the Clayton Act, (15 U.S.C. §§15 and 26) to recover treble damages and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiffs and the members of the Class by reason of the violations of Section 1 of the Sherman Act, 15 U.S.C. §1.

4.    This action is also instituted to secure injunctive relief against Defendants to prevent them from further violations of Section 1 of the Sherman Act, as hereinafter alleged.

5.    Jurisdiction is conferred upon this Court by 28 U.S.C. §§1331 and 1337 and by Sections 4 and 16 of the Clayton Act (15 U.S.C. §§15(a) and 26).

- 1 -

571865_1

6.      Venue is proper in this Judicial District pursuant to 15 U.S.C. §§15(a) and 22, and 28 U.S.C. §1391(b), (c) and (d) because, during the Class Period, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce described below has been carried out in this District.

7.      This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) participated in the sale and distribution of Aftermarket Automotive Lighting Products throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) was engaged in an illegal scheme and price-fixing conspiracy that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.  Further jurisdictional contacts are alleged below.

## PLAINTIFFS

8.      Plaintiff DJ's Autobody, Inc. d/b/a Wheeler's Autobody Supply ("Wheeler's") is an Iowa corporation with its principal place of business located in Waterloo, Iowa.   During the Class Period, Wheeler's purchased Aftermarket Automotive Lighting Products directly from one or more Defendants.  As a result of the alleged conspiracy, Wheeler's was injured in its business or property by reason of the antitrust violations alleged herein.

9.      Plaintiff Dynacorn Autobody Parts, Inc. ("Dynacorn") is a corporation duly organized and existing under the laws of the State of California with its principal place of business located at 950 South A Street, Oxnard, California 93030.  During the Class Period, Dynacorn purchased Aftermarket Automotive Lighting Products directly from one or more Defendants.  As a result of the alleged conspiracy, Dynacorn was injured in its business or property by reason of the antitrust violations alleged herein.

- 2 -

10.   Plaintiff Motoring Parts International ("MPI") is a corporation duly organized and existing under the laws of the State of North Carolina with its principal place of business located at 7412 Fulton Avenue, North Hollywood, California 91605. During the Class Period, MPI purchased Aftermarket Automotive Lighting Products directly from one or more Defendants.  As a result of the alleged conspiracy, MPI was injured in its business or property by reason of the antitrust violations alleged herein.

11.   Plaintiff Prevatte Auto Supply, Inc. ("Prevatte") is a corporation duly organized and existing under the laws of the State of North Carolina with its principal place of business located at 422 Watts Road, Lumberton, North Carolina 28360. During the Class Period, Prevatte purchased Aftermarket Automotive Lighting Products directly from one or more Defendants.  As a result of the alleged conspiracy, Prevatte was injured in its business or property by reason of the antitrust violations alleged herein.

12.   Plaintiff Sioux Plating Co. Inc. ("Sioux Plating") is a corporation duly organized and existing under the laws of the State of Iowa, with its principal place of business located at 428 East 9th Street, South Sioux City, Nebraska 68776.  During the Class Period, Sioux Plating purchased Aftermarket Automotive Lighting Products directly from one or more Defendants.  As a result of the alleged conspiracy, Sioux Plating was injured in its business or property by reason of the antitrust violations alleged herein.

## DEFENDANTS

13.   As described in more detail herein, the Defendants are comprised of Taiwanese manufacturers of Aftermarket Automotive Lighting Products and their subsidiary distributors based in the United States.  In addition, Sabry Lee Limited controlled Sabry Lee, a distributor of Eagle Eyes Aftermarket Automotive Lighting Products and a member of the conspiracy, during the Class Period, and was the alter ego of Sabry Lee.

- 3 -

571865_1

**The TYC Defendants**

14.   Defendant TYC Brother Industrial Co. Ltd. ("TYC") is a corporation organized and existing under the laws of Taiwan with its principal place of business located at 72-2 Shin-leh Road, Tainan, Taiwan 702. TYC is a leading manufacturer of Aftermarket Automotive Lighting Products, which it manufactures in Taiwan and exports for sale around the world, including the United States. TYC's website states that it "produces the most comprehensive aftermarket lamp line in the industry, in addition to designing and manufacturing Original Equipment Lamps for well known two and four wheelers [*sic*] OE vehicle manufacturers in North America, Europe, Asia Pacific, Middle East and Africa." TYC moved into the United States market in 1994. In early 1997, TYC issued its initial IPO, and is now traded as a public company on the Taiwan Stock Exchange. TYC identifies itself as a member of the "TYC Group" of companies, and various press accounts during the class period identify it as a member of the "Ta Yih Group," a group of several companies including TYC and the Ta Yih Industrial Co. Ltd., a Taiwanese manufacturer of OEM car lamps. In both 2003 and 2006, TYC estimated that it accounted for about 70% of North America's auto-insurance auto-lamp aftermarket sales. During the Class Period, TYC's Aftermarket Automotive Lighting Products were sold to Class members in the United States.

15.   Defendant Genera Corporation ("Genera") is a corporation organized and existing under the laws of the State of California with its principal place of business located at 26 Centerpoint Drive, Suite 100, La Palma, California 90623. Genera imports, distributes and sells throughout the United States Aftermarket Automotive Lighting Products imported from Taiwan, generating $178 million a year in sales. Genera is a wholly or partially owned subsidiary of defendant TYC and was formed by TYC in 1991 to be its sole and exclusive United States distributor. Genera stated on its website that it "is the North American distribution arm of TYC," and that it operates "five massive state-of the art distribution centers, strategically located

- 4 -

571865_1

throughout the U.S., providing nearly one million sq. ft. of warehouse space." Genera was founded in 1991 as TYC Industrial U.S.A., and changed its name in 1995 to Genera Corp. Genera estimated on its website that its 2008 sales were expected to exceed $200 million. Genera further states that it "distributes [the] majority of its lighting, mirror, . . . and heat exchanger products through a nation-wide network of warehouse distributors (WD's), who, in turn, market to collision bodyshops and heating/cooling system specialists. In addition, jobber/retail locations represent a growing channel of distribution for TYC products, including most product lines in Canada and lighting products in the U.S."

16. Genera's products include automotive lamps and performance lamps. Genera states on its website the following with respect to its aftermarket products manufactured by defendant TYC: "TYC offers the world's most comprehensive automotive replacement lighting products available, ranging from domestic to import applications, from passenger cars to SUVs."

17. Genera's performance lamp products currently include tail lamps, backup lamps, and headlamps, in multiple colors and paintable, for numerous makes and models of vehicles, including Acura; Chrysler; Chevrolet; Dodge; Ford; GMC; Honda; Lincoln; Mercury; Mitsubishi; Nissan; Pontiac; Saturn; Subaru; Toyota; and Volkswagen. Genera lamps are listed as including the following functionalities: tail; stop; turn signal; side marker; backup; and reflex. Genera provides detailed testing reports via its performance lamp website that document compliance with the photometric requirements of the U.S. Federal Motor Vehicle Safety Standard ("FMVSS"). Genera notes on its performance lamp website that "[w]e currently do not sell Elegante by TYC lamps to the public so all purchases must be through an authorized dealer, whether online or retail location." During the Class Period, Genera sold Aftermarket Automotive Lighting Products to Class members in the United States.

571865_1

**The Depo Defendants**

18.    Defendant Depo Auto Parts Ind. Co., Ltd. ("Depo") is a corporation organized and existing under the laws of Taiwan with its principal place of business located at 20-3, Nan Shih Lane, Lu Kang, Chang-Hwa Hsien, Taiwan 638. Depo is a leading manufacturer of Aftermarket Automotive Lighting Products which it manufactures in Taiwan and exports for sale around the world, including the United States. Depo was formed in 1977 as Ming Yang Corp., and in 2002 was renamed Depo Auto Parts Ind. Co., Ltd. In 2004, it was estimated that Depo accounted for about 35% of the American aftermarket lamp market, trailing only defendant TYC. In 2004, Depo became a publicly-traded company on the Taiwan Stock Exchange. Depo develops, manufactures, and distributes replacement lamps for vehicles under its "Depo" and "Lucid" brands.   During the Class Period, Depo's Aftermarket Automotive Lighting Products were sold to Class members in the United States.

19.    Defendant Maxzone Vehicle Lighting Corp. ("Maxzone") is a corporation organized and existing under the laws of the State of California with its principal place of business located at 11016 Mulberry Avenue, Suite B, Fontana, California 92337. Maxzone imports, distributes and sells throughout the United States Aftermarket Automotive Lighting Products imported from Taiwan. Maxzone is a wholly or partially owned subsidiary of defendant Depo and was formed by Depo in 1997 to be its exclusive United States distributor. Maxzone's website states that "[a]ll our automotive lamp products are designed, developed and produced by our parent company, DEPO Auto Parts Corp, a world class manufacturer of automotive replacement lamps. . . . DEPO has Maxzone to take care of North America distribution and [the] Taipei business office to take responsibility for the sale of Europe, Africa, South America and Australia area." Maxzone's website states that "[i]n addition [to] our aftermarket auto lamps, our product lines include OEM lamps, performance lamps, window regulator and door handle." Maxzone's products include replacement lights and performance lights. Maxzone has four distribution centers,

- 6 -

1  located in: Elmwood Park, NJ; Atlanta, GA; Elgin, IL; Fontana, CA and an office in

2  Etobicoke Ontario, Canada. Maxzone's website further notes that it "only sells

3  wholesale." During the Class Period, Maxzone sold Aftermarket Automotive

4  Lighting Products to Class members in the United States.

5  **The Eagle Eyes and Sabry Lee Defendants**

6      20.    Defendant Eagle Eyes Traffic Ind. Co. Ltd. ("Eagle Eyes") is a

7  corporation organized and existing under the laws of Taiwan with its principal place

8  of business located at No. 27 Lane 764 Chung Shan N. Rd., Yung Kang City, Taiwan

9  Hsien, Taiwan. Eagle Eyes is a manufacturer of Aftermarket Automotive Lighting

10  Products which it manufactures in Taiwan and exports for sale around the world,

11  including the United States. Eagle Eyes was formed in 1979, and its website states

12  that it "devotes itself to the production of high quality automotive lamps, both spare

13  and performance. We serve global AM customers in nearly 100 countries. This ISO

14  9001: 2000 certified cooperation [*sic*] is confident with its ability to provide safety

15  and fulfillment to its customer consistently. In addition to our qualified spare

16  products, we also design and produce stylish performance lamps which make us one

17  of the leading performance lamp suppliers around the world." Eagle Eyes' products

18  include replacement auto lamps and performance lamps, including rear lamps, head

19  lamps, signal lamps, fog lamps, park lamps, side marker lamps, and corner lamps for

20  numerous makes and models of vehicles. The term "Eagle Eyes" includes any wholly

21  or partly owned subsidiary of Eagle Eyes involved in the market for Aftermarket

22  Automotive Lighting Products whose business operations were controlled by Eagle

23  Eyes at any time during the Class Period. During the Class Period, Eagle Eyes sold

24  Aftermarket Automotive Lighting Products to Class members in the United States.

25      21.    Defendant E-Lite Automotive Inc. ("E-Lite") is a corporation duly

26  organized and existing under the laws of the State of California with its principal place

27  of business located at 14401 Monte Vista Avenue, Chino, California 91708. E-Lite

28  imports, distributes and sells, throughout the United States, Aftermarket Automotive

- 7 -

Lighting Products imported from Taiwan.  E-Lite is a wholly or partially owned subsidiary of defendant Eagle Eyes and was formed by Eagle Eyes in 2006 to be principal United States distributor of Eagle Eyes Aftermarket Automotive Lighting Products.  E-Lite's website states that "E-Lite U.S.A. Automotive, a partner of Eagle Eyes Corporation, was founded in 2006" and that "[a]ll of our lamps are made by Eagle Eyes Corporation" and that "[w]e specialize in headlights, taillights, corner lights, parking lights, and fog lights in the aftermarket lamps market," and that "E-Lite produces a wide array of lamps intended for use in all major North American car manufacturers' products."   During the Class Period, E-Lite sold Aftermarket Automotive Lighting Products to Class members in the United States.

22.    Defendant Sabry Lee (U.S.A.), Inc. ("Sabry Lee") was formed on or about January 1, 2001 and, during all or part of the Class Period, was a major United States distributor of Aftermarket Automotive Lighting Products manufactured by Eagle Eyes.  Sabry Lee is a corporation duly organized and existing under the laws of the State of California with its principal place of business located at 21301 Ferrero Parkway, Industry, California, 91789.  During all or part of the Class Period, Sabry Lee was owned and/or controlled by Eagle Eyes and Sabry Lee Limited.   For example, as set forth in more detail below, Sabry Lee's Executive Vice President Andrew Chen regularly reported to Eagle Eyes' and Sabry Lee Limited's management on Sabry Lee's involvement in the price-fixing conspiracy.  Further, Eagle Eyes was held responsible by the other Defendants for directing and assuring Sabry Lee's participation in supporting Defendants' pricing agreement.

23.    Defendant Sabry Lee Limited is a private limited company organized and existing under the laws of Hong Kong with its principal place of business at 5/F Chung Nam Bldg., 1 Lockhard Road, Wan Chai, Hong Kong Island, Hong Kong.

24.    Sabry Lee Limited owned and controlled Sabry Lee during the Class Period, and exercised dominion and control over its actions and affairs to such an extent that Sabry Lee Limited is the alter ego of Sabry Lee.  The unity of interest

- 8 -

between Sabry Lee Limited and Sabry Lee is so extensive that the two entities did not exist as separate companies during the Class Period.  To ignore these two Defendants' unity of interest and honor their purported corporate separateness would result in fraud and injustice.  Specifically:

(a)    During the Class Period, both companies shared key executives, who together owned the majority of shares in Sabry Lee Limited and Sabry Lee. Chao Sung Tsai (a/k/a Johnson Tsai), the Founder and Principal of Sabry Lee Limited, was the President and Chief Executive Officer of Sabry Lee and a major shareholder in Sabry Lee.  Shu Chen Yang (a/k/a Susan Yang) was a Principal in Sabry Lee Limited, major shareholder in Sabry Lee Limited, a principal shareholder in Sabry Lee, and served as the Chief Financial Officer of Sabry Lee.

(b)    While serving as Executive Vice President of Sabry Lee, Andrew Chen reported directly to Chao Sung (Johnson) Tsai, and communicated with him about the price-fixing conspiracy.

(c)    Shortly before and just after Sabry Lee filed its complaint alleging that the other Defendants conspired to fix prices and drive competitors out of the market on September 3, 2008, Shu Chen (Susan) Yang of Sabry Lee issued large amounts of Sabry Lee's stock to Sabry Lee Limited.  In two separate transactions filed with the State of California on August 29, 2008 and September 11, 2008, Sabry Lee issued securities worth more than $15 million to Sabry Lee Limited in an effort to shield Sabry Lee's assets from possible criminal fines and civil damages claims in the United States.  Shortly after Plaintiffs filed their initial class action complaint in this action, Andrew Chen fled to Taiwan, where he has remained in an effort to avoid criminal and civil liability.

25.    Defendants TYC, Genera, Depo, Maxzone, Eagle Eyes, E-Lite, Sabry Lee, and Sabry Lee Limited are collectively referred to herein as "Defendants." Defendants TYC, Depo, and Eagle Eyes are collectively referred to herein as

- 9 -

"Manufacturer Defendants." Defendants Genera, Maxzone, E-Lite and Sabry Lee are collectively referred to herein as "Distributor Defendants."



26. The principal agents of the conspiracy are the following:

| NAME | TITLE | COMPANY |
|---|---|---|
| Chang, Jing Fang | Asst. Mgr. | TYC |
| Chang, Orian aka Orian Cheng | N. American Sales Mgr. | TYC/Genera |
| Chen, Andrew | V.P. | Sabry Lee |
| Chen, Galen | V.P. Bus & Dev.; Marketing Director | Maxzone |
| Ho (He), David (Gong Yun) | President | TYC |
| Hsia (Xia), Drue An | President | Genera |
| Hsu, Chiang | CEO | TYC |
| Hsu, (Homy) Hong Ming | Vice Chairman | Eagle Eyes |
| Hsu, Polo Shu Sheng | President | Maxzone |
| Hsu, Shiu-Min (Hsu Hsu Ming) | President/Chairman | DEPO |
| Hu, Michael | Marketing Director; Sales Manager | DEPO |
| Kwok, Jackson Ching | Spec. Asst. to Pres.; Snr. Dir. Bus. Dev. | Genera |
| Lee, George | President | E-Lite |
| Lai, Ching-Tsung | TBD | Eagle Eyes |
| Lin, Eldon | Asst. Gen. Mgr. | TYC |
| Lin, Shin Chi Gary | President | E-Lite |

- 10 -

| NAME | TITLE | COMPANY |
|------|-------|---------|
| Lin, Yu-Chu/Yu-Chin (Lin Yu Zhu) | Chairman | Eagle Eyes |
| Ting, Carlos | AM/OEM Sales Dir. | TYC/Genera |
| Wang, Philo | Chairman, CEO | Genera |
| Wong, Annie | Sr. Mgr. Product Mgmt. | TYC/Genera |
| Wu, Chun Chi "CC" (Wu Jun Ji) | Chairman | TYC |

27.    Whenever in this Amended Complaint reference is made to any act, deed or transaction of any corporation, the allegation means that the corporation engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

28.    All acts alleged in this Amended Complaint to have been done by Defendants were performed by their officers, directors, agents, employees or representatives while engaged in the management, direction, control or transaction of Defendants' business affairs.

## CO-CONSPIRATORS

29.    On information and belief, various other companies and individuals, not named as Defendants in this Amended Complaint, may have participated as co-conspirators in the acts complained of herein, and performed acts and made statements in furtherance of such conspiracy.

## TRADE AND COMMERCE

30.    With over 225 million vehicles in the United States, the automotive aftermarket industry is substantial.  Sales of aftermarket automotive products in the United States exceed $185 billion annually.

- 11 -

31.    The percentage of the entire aftermarket automotive products that is made up of Aftermarket Automotive Lighting Products represents a significant amount of commerce, with nearly $200 million in annual sales in the United States.

## CHARACTERISTICS OF THE MARKET FOR AFTERMARKET AUTOMOTIVE LIGHTING PRODUCTS THAT FACILITATE COLLUSION

**Market Concentration**

32.    As the demand for automotive repair parts grew in the 1950's and 1960's, non-OEM parts manufacturers entered the market where independent mechanics, but not dealers, purchased the parts.  This is referred to as an aftermarket.  An aftermarket is the market for replacement and supplementary parts and/or repair services for a product that the buyer has previously acquired, or for products consumed through the use of the original product.  Aftermarket Automotive Lighting Products constitute a market distinct from lighting products supplied by third parties to vehicle manufacturers for incorporation into new vehicles, and also distinct from the market for original equipment replacement parts made by the manufacturers of automobiles, or for those manufacturers by third parties.  There is a significant difference in the list price, often 30% or larger, between an OEM product and a comparable aftermarket product.  In addition, most insurance carriers that supply coverage for automobile collisions require automotive body shops to purchase and use aftermarket products on repairs paid for by the insurance carriers.  Accordingly, aftermarket products and products of original equipment manufacturers are not reasonably interchangeable substitutes from the point of view of the purchaser and are not in direct and substantial competition with each other.

33.    Aftermarket prices are cheaper than OEM prices because aftermarket companies specialize in such products and tend to redesign and make more cost efficient changes as compared to the OEM product, resulting in lower prices.

- 12 -

34.     Aftermarket Automotive Lighting Products includes parts most often replaced following collisions, which have the same specifications as OEM parts but are often sold without automaker certification.

35.     Collectively, the products of the Manufacturer Defendants comprise the vast majority (90%) of all Aftermarket Automotive Lighting Products sold in the United States, and as a consequence, their Distributor Defendant affiliates also control the vast majority (over 90%) of the Aftermarket Automotive Lighting Product market in the United States.

36.     Aftermarket Automotive Lighting Products are highly fungible. Purchasers decide on a product, and competitors compete for purchasers, largely based on price.  There are no other substitutable products for Aftermarket Automotive Lighting Products.   Price-fixing and market allocation are particularly pernicious within a highly concentrated, fungible market for which adequate substitutes do not exist, as is the case here.  One example of the fungibility of the products in this market is Genera's "TYC Part Interchange" featured on its website, where users can input a "Part Interchange Query" by selecting a "Competitor Number" and then receive information about an equivalent, and interchangeable part.

37.     Typically, when an order is placed with a plaintiff for an Aftermarket Automotive Lighting Product, a brand is not specified.   For example, when a customer, such as an autobody repair shop, requests a tail lamp for a 2000 Jeep Cherokee, the customer does not request a certain manufacturer or care whether the lamp comes from TYC, Depo or Eagle Eyes.

**Barriers To Entry**

38.     There are significant barriers to entry in the market for Aftermarket Automotive Lighting Products that have facilitated Defendants' collusion as described herein.  These include substantial research and development costs, and the costs of developing and maintaining a robust distribution system.  Two other barriers of importance are: (a) the need to obtain various quality certifications for aftermarket

- 13 -

1    products; and (b) the collusive business setting in which manufacturers of aftermarket

2    automotive parts in Taiwan, including the Manufacturer Defendants, operate.

3    **Effects of CAPA Certification Program on the Market**

4    39.    The Certified Automotive Parts Association ("CAPA") is a non-profit

5    organization established to develop and oversee a test program guaranteeing the

6    suitability and quality of automotive parts.    Its website states "CAPA encourages

7    competition in the marketplace in the hope that their program will ultimately reduce

8    expense to the consumer and the industry while increasing and assuring part quality."

9    In fact, Defendants' participation in CAPA certification facilitated the maintenance of

10    the illegal price-fixing scheme described herein, as it created further barriers to entry

11    and limited competition.    The Manufacturer Defendants are all participating

12    manufacturers in the CAPA certification program.

13    40.    By way of background regarding quality certification, an Illinois class

14    action against the State Farm insurance company, commenced in 1997, had a dramatic

15    effect on the market for aftermarket automotive parts.    In that case, the plaintiffs

16    accused State Farm, the largest automobile insurer in the United States, of breaching

17    its contracts with policyholders when it specified the use of non-original equipment

18    parts in the repair of vehicles damaged in crashes.    In 1999, a jury awarded $456

19    million to the plaintiffs, and the presiding judge awarded an additional $730 million,

20    including $600 million in punitive damages.    In the wake of these combined awards in

21    excess of $1 billion, the North American market for aftermarket parts dropped by

22    about 40% in 2000, resulting in challenging times for almost all Taiwan aftermarket

23    parts suppliers during the following two to three years.    In 2005, the Illinois Supreme

24    Court eventually reversed all awards made against State Farm, and in 2006, the United

25    States Supreme Court declined to hear plaintiffs' appeal.

26    41.    Following the United State Supreme Court's decision to not hear an

27    appeal in the *State Farm* case, and State Farm's expected decision to once again

28

- 14 -

1  utilize aftermarket parts, Taiwan news reports in 2006 quoted local aftermarket parts

2  makers as predicting a return to sales levels even higher than in 1999.

3      42.    The impact of the *State Farm* case had begun to soften in 2002, as a

4  group of United States auto insurance firms (not including State Farm) resumed the

5  use of aftermarket parts. By mid-2006, the aftermarket parts market recovered to, or

6  even exceeded, the pre-1999 levels.

7      43.    The *State Farm* case jump-started a move by Taiwanese aftermarket parts

8  makers in 2000 to join quality-control organizations such as CAPA, and to actively

9  increase the number of their CAPA-approved items available to the auto-insurance

10  market. Several years later, CAPA decided to add a quality certification program for

11  lighting products, which it previously did not offer.

12      44.    Defendant Genera, the exclusive United States distributor for defendant

13  TYC, states on its website the following regarding CAPA certification:

> CAPA created standards for the objective evaluation and certification of
> sheet metal, bumper, and other automotive collision replacement parts.
>
> Because exterior lighting products represent about one-quarter of the
> total cost of replacement parts used in collision repair, CAPA has
> developed a quality certification program for lighting products. In
> September, 2005, TYC, through extensive collaboration with CAPA,
> became the first manufacturer to achieve CAPA certification of lighting
> parts.
>
> CAPA certified TYC lighting products are of OE-comparable form
> (appearance), fit (installation), and function (performance), are highly
> regarded as a viable alternative quality part, and are quickly gaining
> awareness and enthusiastic acceptance by collision repairers.
>
> Approximately 7 out of 10 national auto insurance companies prescribe
> CAPA parts, many of whom prescribe CAPA certified lamps. TYC's
> CAPA certified lamps create repair opportunities that previously did not
> exist by driving more business to repairers and substantially reducing the
> percentage of vehicles declared total-loss in a collision repair estimate.
>
> TYC offers the broadest CAPA certified lighting products in the market
> and is consistently developing popular applications, with internal testing
> labs that accelerate release timing of new items. Our aggressive
> production inventory planning ensures the highest fill rate and ability to
> meet growing demand via our five strategically located distribution
> centers throughout the U.S.

- 15 -

571865_1

45.     Depo also joined the CAPA certification in 2005, and by the end of that year, Depo owned 18 CAPA certified lamp sets, and TYC owned 3. TYC planned to own 150 to 2000 certified lamp sets by the end of 2006. A Taiwanese news account in 2006 noted that CAPA's decision was expected to increase the confidence of policyholders in the use of AM parts to repair their vehicles, gradually squeeze low-quality parts from the market, improve the quality of certified parts, and enhance the profit margins of manufacturers in Taiwan.

46.     In 2005, Michael Hu, Depo's sales manager, was quoted as stating that "[t]he sale of [AM] auto lamps in the U.S. was growing steadily even before the CAPA decision [to provide certification for automotive lighting products.] [N]ow, we see even greater growth momentum ahead. The more lamp models that are certified, the stronger the growth momentum will be, because the insurance companies will have more choices of parts to substitute for OE parts." Mr. Hu went on to contrast the more competitive European market with the less-competitive U.S. market as follows: "In Europe, . . . competition . . . is much fiercer than in America for Taiwanese auto-lamp makers, because all OE auto-lamp suppliers there also supply the OES (original equipment service) market where replacement parts are distributed under the automakers' own brands and through the automakers' maintenance networks."

47.     Also in 2006, TYC's director of aftermarket and OEM sales, Carlos Ting, was quoted as stating that "CAPA certification will bring a better market in North America for quality-oriented auto-lamp suppliers like TYC . . . because poor-quality products have destroyed the *market order* there in the past few years." (Emphasis added).

48.     In 2006, TYC's manager of North American sales, Orian Chang, was quoted as stating that "CAPA certification is a challenge for all auto-lamp makers . . . because it requires even higher levels of quality and safety than is required for OEM items. CAPA approval will create lucrative business opportunities for the companies that can qualify." Not surprisingly, TYC's global sales grew by 10% to

- 16 -

571865_1

20% in the first half of 2006, depending on market area, and Mr. Ting attributed the substantial sales growth in part to TYC's increasing number of CAPA-certified products.

49.     CAPA commands a fee from manufacturers in order to ostensibly test Aftermarket Automotive Lighting Products that manufacturers submit for CAPA certification. Manufacturers, such as Defendants, have an incentive to obtain CAPA certification of parts because such parts can be sold at a considerably higher price than non-CAPA certified parts.

50.     The Defendants used CAPA as another vehicle to promote their anticompetitive manipulation of the market. Rather than compete with each other to gain a competitive edge over one another by obtaining exclusive CAPA certification of a particular part, Defendants coordinated their CAPA certification submissions. Defendants agreed which Aftermarket Automotive Lighting Products would be submitted for CAPA certification together and Defendants shared the cost of CAPA certification.

51.     CAPA further facilitated Defendants' conspiracy by participating in the meetings among Defendants and agreeing to cooperate with Defendants' joint payment and joint submissions for certification.

52.     Other certification programs existed for Aftermarket Automotive Lighting Products. For example, the Manufacturers' Qualification and Validation Program ("MQVP") certified the quality and safety of some non-OEM parts. The program outlined policies and quality-management practices designed to ensure that repair parts are equal to original parts in form, function, and durability. In 2003, it was reported that defendant TYC claimed to have the highest ratio of MQVP-certified products among all the world's auto-parts makers. That year, Nationwide Mutual Insurance Co., the sixth largest insurer in the United States, approved the use of TYC aftermarket lamps as replacement parts following certification of those lamps by the MQVP.

- 17 -

571865_1

53.     It was also reported in 2003 that another development that encouraged the use of non-OE parts is the differential-premium system offered by insurance companies in the United States, allowing policyholders to opt for lower premiums if they accepted the use of non-OEM parts to repair their insured cars.

## DEFENDANTS' ANTITRUST VIOLATIONS

54.     Defendants are horizontal competitors at the manufacturing and distributor levels, respectively, and collectively conspired to fix the prices of and artificially manipulate the market for the importation, sale and distribution throughout the United States of Aftermarket Automotive Lighting Products.   Each of the Distributor Defendants is, or was during some or all of the Class Period, either the main or exclusive distributor of Aftermarket Automotive Lighting Products made by a specific Manufacturer Defendant located in Taiwan.   Defendant Genera is wholly or partially owned by and is the exclusive importer and seller of the lighting products made by defendant TYC; defendant Maxzone is wholly or partially owned by and is the exclusive importer and seller of the lighting products of defendant Depo; and defendant E-Lite is wholly or partially owned by and is the exclusive importer and seller of the lighting products of defendant Eagle Eyes.   For at least part of the Class Period, Sabry Lee was a major distributor of Eagle Eyes Aftermarket Automotive Lighting Products and was jointly owned and/or was controlled by Eagle Eyes and Sabry Lee Limited.

55.     Beginning at least as early as July 29, 2001 and continuing up to the present, Defendants and their co-conspirators combined and conspired to unreasonably restrain competition in interstate commerce in the importation, sale and distribution of Aftermarket Automotive Lighting Products in the United States, in violation of Section 1 of the Sherman Act (15 U.S.C. §1).

56.     The purpose and effect of Defendants' price-fixing conspiracy has been to eliminate competition among and between themselves and to eliminate customer choice by establishing artificially high and noncompetitive prices for Aftermarket

- 18 -

Automotive Lighting Products in the United States.  This price-fixing agreement constitutes a *per se* violation of Section 1 of the Sherman Act (15 U.S.C. §1) in that it eliminates competition and customer choice.

57.     From at least July 29, 2001 through the present, Defendants engaged in extensive price-fixing of Aftermarket Automotive Lighting Products.  Defendants' unlawful conspiracy had the effect of, among other things, raising prices of those products and eliminating competitors from the market, thereby further restraining trade in the importation, distribution and sale of aftermarket automotive lights throughout the United States.

58.     The Defendants also employed anticompetitive tactics to eliminate distributors who refused to participate in Defendants' price-fixing scheme and others who posed a competitive threat.  The effect of Defendants' anticompetitive conduct has been to reduce the number of competitors selling the relevant products to Plaintiffs and the Class.

59.     On September 3, 2008, Sabry Lee filed an individual complaint alleging, based on first-hand knowledge, that the other Defendants met and conspired to fix prices of Aftermarket Automotive Lighting Products and to exclude competitors from the market through their pricing agreements.  It specifically identified by name some of the executives and managers from Defendants who participated in meetings with their horizontal competitors to fix prices, as well as the locations where some of the price-fixing meetings took place.

60.     As set forth in more detail below, beginning at least as early as 2001, the Defendants conspired to and did fix prices of Aftermarket Automotive Lighting Products, and also conspired to and did exclude potential competitors from the market.

**Specific Acts in Furtherance of the Conspiracy**

61.     Defendants' documents have revealed details of the long-running and egregious conspiracy.  While there are undoubtedly many other specific facts

- 19 -

1   underlying Defendants' price-fixing activities, Plaintiffs are aware of numerous

2   specific acts taken in furtherance of the conspiracy.

3     62. ███████████████████████████████████████████

4 ████████████████████████████████████████████████████

5 ████████████████████████████████████████████████████

6 ████████████████████████████████████████████████████

7 ████████████████████████████████████████████████████

8 ████████████████████████████████████████████████████

9 ████████████████████████████████████████████████████

10 ████████████████████████████████████████████████████

11 ████████████████████████████████████████████████████

12 ████████████████████████████████████████████████████

13 ████████████████████████████.

14     63. ███████████████████████████████████████████

15 ████████████████████████████████████████████████████

16 ████████████████████████████████████████████████████

17 ████████████████████████████████████████████████████

18 ████████████████████████████████████████████████████

19 ████████████████████████████████████████████████████

20 ██████████████████████████████████████████████████.

21     64. ███████████████████████████████████████████

22 ████████████████████████████████████████████████████

23 ████████████████████████████████████████████████████

24 ████████████████████████████████████████████████████

25 ████████████████████████████████████████████████████

26 ████████████████████████████████████████████████████

27 ██████████████████████████████.

28

571865_1

65. ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████.

66.     Thereafter, from 2002 through 2008, the Manufacturing and Distributor Defendants routinely exchanged complete pricing information and set their prices together.  Numerous price lists were generated showing prices of each Defendant side-by-side.

67.     The Defendants also acted throughout the conspiracy to monitor each other's prices, and to detect and punish potential cheating. ████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████

68.     In addition to threatening retaliation against cheaters, the Defendants repeatedly exhorted each other to adhere to the price-fixing agreement for their collective good, because price competition could be disastrous for them all. ████████
████████████████████████████████████████████
████████████████████████████████████████████

- 21 -

571865_1

1 ███████████████████████████████████████████████████

2 ███████████████████████████████████████████████████

3 ███████████████████████████████████████████████████

4 ███████████████████████████████████████████████████

5 ███████████████████████████████████████████████████

6 ███████████

7 ███████ In  early  August  2003,  the  Defendants  refined  their  price-fixing

8 agreement. ████████████████████████████████████████

9 ███████████████████████████████████████████████████

10 ███████████████████████████████████████████████████

11 ███████████████████████████████████████████████████

12 ███████████████████████████████████████████████████

13 ███████████████████████████████████████████████████

14 ███████████████████████████████████████████████████

15 ███████████████████████████████████████████████████

16 ███████████████████████████████████████████████████

17 ███████████████████████████████████████████████████

18 ███████████████████████████████████████████████████

19 ███████████████████████████████████████████████████

20 ███████████████████████████████████████████████████

21 ███████████████████████████████████████████████████

22 ███████████████████████████████████████████████████

23 ████████████████████████████████

24    70.   █████████████████████████████████████████

25 ███████████████████████████████████████████████████

26 ███████████████████████████████████████████████████

27 ███████

28

571865_1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24      71.

25

26

27

28

571865_1

72.

73.

74.

571865_1

1 ███████████████████████████████████████████████████
2 ███████████████████████████████████████████████████
3 ███████████████████████████████████████████████████
4 ███████████████████████████████████████████████████

5 ███████████████████████████████████████████████████

6 ███████████

7      75. ████████████████████████████████████████████████

8 ███████████████████████████████████████████████████

9 ███████████████████████████████████████████████████

10 ███████████████████████████████████████████████████

11 █████████████

12      76. ████████████████████████████████████████████████

13 ███████████████████████████████████████████████████

14 ███████████████████████████████████████████████████

15 ███████████████████████████████████████████████████

16 ██████████████████████████████████

17      77.    On or about November 7, 2004, the Distributor Defendants met during

18 the AAPEX convention in Las Vegas. ████████████████████████████

19 ███████████████████████████████████████████████████

20 ███████████████████████████████████████████████████

21 █████████

22      78. ████████████████████████████████████████████████

23 ███████████████████████████████████████████████████

24 █████████████████████████ In addition to discussing  the logistics of

25 CAPA light testing, appearance, and samples, the meeting participants also discussed

26 the pricing of their products.

27      79.    Pricing decisions were made not only in Taiwan, but also in California at

28 the offices of the Distributor Defendants. █████████████████████████

571865_1

1

2

3

4

5

6

7

8

9

10

11

12

13     80.

14

15

16

17     81.

18

19

20     82.

21

22                                                    The Defendants' price-fixing

23  conspiracy, however, continued without interruption.

24     83.

25

26

27

28

- 26 -

571865_1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18     84.
19
20
21
22
23
24
25
26
27     85.
28

571865_1



86.

**Department of Justice Investigation**

87.    Following the filing of this class action, at the request of the Antitrust Division of the United States Department of Justice ("DOJ"), a federal grand jury was empanelled in the Northern District of California to investigate possible criminal antitrust violations against TYC/Genera, Depo/Maxzone and Eagle Eyes/E-Lite with respect to Aftermarket Automotive Lighting Products.   In February 2009, the investigation became public when the DOJ moved to intervene in this action.

571865_1

88.     In an effort to limit its civil liability and avoid criminal prosecution, at least one of the Defendants has applied for leniency under the DOJ's corporate leniency program.                    *See*                    *generally* http://www.justice.gov/atr/public/criminal/leniency.htm. Under the DOJ's program, the first member of a price-fixing conspiracy that reports the illegal cartel and cooperates with the DOJ can avoid criminal penalties. According to DOJ guidelines, a corporate leniency applicant must "report . . . their illegal antitrust activity. . . . Thus, the applicant must admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers, or sales or production volumes before it will receive a conditional leniency letter. . . A company that, for whatever reason, is not able or willing to admit to its participation in a criminal antitrust conspiracy is not eligible for leniency." *See* U.S. Department of Justice, *Frequently Asked Questions Regarding the Antitrust Division's Leniency Program and Model Leniency Letters* (Nov. 19, 2008), *id.*

89.     The DOJ granted conditional amnesty to the Defendant-applicant. The "conditional" nature of the grant reflects the DOJ's regular practice in these circumstances, and recognizes that the amnesty applicant, in summary, must provide on-going cooperation to the DOJ in the Department's continuing investigation and in any criminal actions that may be prosecuted against other members of the conspiracy.

90.     Additionally, upon information and belief, the DOJ has informed Sabry Lee that it is exposed to criminal charges based on its involvement in the price-fixing conspiracy. Indeed, during the deposition of Sabry Lee's former National Sales Manager, Larry Capitano, taken by Class Plaintiffs in this action on June 4, 2010, Mr. Capitano asserted his Fifth Amendment privilege to refuse to testify in response to every substantive question.

91.     Galen Chen, Vice President of Business & Development and Marketing Director of Distributor Defendant Maxzone, and Jackson Kwok, Special Assistant to President and Senior Director of Business Development of Distributor Defendant

- 29 -

1 Genera, the only other witnesses deposed by Plaintiffs as of the date of the Amended

2 Complaint, also asserted their Fifth Amendment privilege to refuse to testify.

### ANTICOMPETITIVE EFFECTS OF VIOLATION ON PLAINTIFF AND THE CLASS

92.  The conduct of Defendants described in this Amended Complaint has produced antitrust injury, and unless restrained, will continue to produce the following anticompetitive effects, among others:

(a)  competition in the importation, distribution and sale of Aftermarket Automotive Lighting Products in the United States has been and continues to be substantially and unreasonably restricted, lessened, foreclosed and eliminated;

(b)  barriers to entry into the production, distribution and sale of Aftermarket Automotive Lighting Products in the United States have been raised;

(c)  prices for customers seeking Aftermarket Automotive Lighting Products in the United States have risen and will continue to do so;

(d)  customers seeking Aftermarket Automotive Lighting Products in the United States are, and will be, deprived of choice with respect to price and vendor/manufacturer; and

(e)  the importation, distribution and sale of Aftermarket Automotive Lighting Products in the United States will continue to be artificially restrained.

### EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

93.  Throughout the Class Period, Defendants and their co-conspirators affirmatively and fraudulently concealed their unlawful conduct.

94.  Neither Defendants nor their co-conspirators told Plaintiffs or other Class members that they were fixing prices or allocating markets. Accordingly, Plaintiffs and Class members could not have discovered the violations alleged herein earlier until shortly before the filing of the first Complaint in the actions comprising this litigation because Defendants and their co-conspirators conducted their conspiracy

571865_1

1  secretly, concealed the nature of their unlawful conduct and acts in furtherance

2  thereof, and fraudulently concealed their activities through various other means and

3  methods designed to avoid detection.

4        95.    Defendants and their co-conspirators engaged in a successful price-fixing

5  conspiracy, which they affirmatively concealed by, *inter alia*: (a) meeting secretly to

6  discuss prices, customers and markets of Aftermarket Automotive Lighting Products

7  sold in the United States and elsewhere; (b) using methods of communication in

8  furtherance of the alleged conspiracy that were designed to avoid detection; (c) giving

9  pretextual reasons for price increases on Aftermarket Automotive Lighting Products,

10  through, for example, statements that they needed to increase prices in order to cover

11  the rising costs of raw materials; (d) staging price movement in an agreed order to

12  make it appear the price changes were the result of competitive pressures rather than

13  collusion; and (e) agreeing among themselves at meetings and in communications not

14  to discuss publicly, or otherwise reveal, the nature and substance of the acts and

15  communications in furtherance of their illegal scheme.

16        96.    In order to conceal their efforts to fix prices, Defendants used methods of

17  communication, such as using terms like "1st company" and "3rd company" instead

18  of the actual names of Defendants, that were designed to avoid detection.

19        97.    As a result of Defendants' fraudulent concealment, all applicable statutes

20  of limitations affecting the Plaintiffs' and the Class's claims have been tolled.

21  Plaintiffs and the Class members did not discover, nor could have discovered through

22  reasonable diligence, that Defendants and their co-conspirators were violating the

23  antitrust laws until September 2008, when Sabry Lee filed a lawsuit that revealed

24  some of the details of Defendants' unlawful and collusive scheme. Plaintiffs could

25  not have discovered the existence of the combination and conspiracy alleged herein at

26  an earlier date by the exercise of reasonable due diligence because of the deceptive

27  practices and techniques of secrecy employed by the Defendants and their co-

28  conspirators to avoid detection and affirmatively conceal such violations. Further,

- 31 -

571865_1

1   Plaintiffs could not have discovered that Defendants' conspiracy began in 2001, until

2   after the document and deposition discovery stays were lifted in this case, in late

3   October 2009 and March 2010, respectively.

4       98.    Plaintiffs did not know and could not have known about Sabry Lee's and

5   Sabry Lee Limited's role in the price-fixing conspiracy until just before the filing of

6   this Complaint.  When Sabry Lee filed its complaint in September 2008, it omitted

7   most of the details of the price-fixing conspiracy, including all relevant details about

8   its own role in the conspiracy.  In fact, Sabry Lee affirmatively denied its participation

9   in the conspiracy, alleging in both its initial complaint and its February 19, 2009

10  amendment that "[w]hile plaintiff's representative attended many of these meetings

11  prior to 2007, plaintiff did not agree to the distributors' fixed prices."  It was not until

12  after the document and deposition discovery stays were lifted in this case, in late

13  October 2009 and March 2010, respectively, that Plaintiffs could reasonably have

14  learned any of the true facts about Sabry Lee's role in the price-fixing conspiracy.

15  Plaintiffs did not know the extent of Sabry Lee's role in the price-fixing conspiracy

16  until June 2010, when Sabry Lee's former Sales Manager, Larry Capitano, asserted

17  his Fifth Amendment privilege to refuse to testify, and Plaintiffs learned that the DOJ

18  informed Sabry Lee, also in June 2010, that it is exposed to criminal charges.

19      99.    Because the contract, combination, or conspiracy was kept secret by the

20  defendants, Plaintiffs were unaware of the fact that prices of Aftermarket Automotive

21  Lighting Products were secretly raised, fixed, maintained or stabilized as alleged

22  herein.

23      100.   As a result of the fraudulent concealment of the conspiracy, Plaintiffs

24  assert the tolling of the applicable statute of limitations affecting the causes of action

25  by Plaintiffs and the members of the Class.

26

27

28

571865_1

## CLASS ACTION ALLEGATIONS

101.   Plaintiffs bring this action on behalf of themselves and as a class action under the provisions of Rule 23(a) and (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following Class:

> All persons and entities that purchased Aftermarket Automotive Lighting Products in the United States, and its territories and possessions, directly from a Defendant between at least as early as July 29, 2001 and February 10, 2009 (the "Class Period"). This class excludes any judicial officer who is assigned to hear any aspect of this action, governmental entities, Defendants, co-conspirators, and the present and former parents, predecessors, subsidiaries and affiliates of the foregoing.

102.   Plaintiffs believe that there are at least hundreds of Class members as above described, the exact number and their identities being known by Defendants, making the Class so numerous and geographically dispersed that joinder of all members in impracticable.

103.   There are questions of law and fact common to the Class, which questions relate to the existence of the conspiracy alleged, and the type and common pattern of injury sustained as a result thereof, including, but not limited to:

(a)   Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain and/or stabilize prices of Aftermarket Automotive Lighting Products and/or engaged in market allocation for those products sold in the United States, and its territories and possessions;

(b)   The identity of the participants in the conspiracy;

(c)   The duration of the conspiracy alleged in this Amended Complaint and the nature and character of the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)   Whether the alleged conspiracy violated Section 1 of the Sherman Act;

- 33 -

571865_1

(e)     Whether the conduct of Defendants and their co-conspirators, as alleged in this Amended Complaint, caused injury to the business and property of Plaintiffs and other members of the Class;

(f)     The effect of Defendants' conspiracy on the prices of Aftermarket Automotive Lighting Products sold in the United States and its territories and possessions during the Class Period; and

(g)     The appropriate measure of damages sustained by Plaintiffs and other members of the Class.

104.   Plaintiffs are direct purchasers of Aftermarket Automotive Lighting Products and their interests are coincident with and not antagonistic to those of the other members of the Class.  Plaintiffs are members of the Class, have claims that are typical of the claims of the Class members, and will fairly and adequately protect the interests of the members of the Class.   In addition, Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

105.   The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications.

106.   Defendants have acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

107.   The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

108.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently and without duplication of effort and expense that numerous individual actions would engender.  The Class is readily definable and

571865_1

is one for which records should exist in the files of Defendants and their co-conspirators, and prosecution as a class action will eliminate the possibility of repetitious litigation. Class treatment will also permit the adjudication of relatively small claims by many Class members who otherwise could not afford to litigate an antitrust claim such as is asserted in this Amended Complaint. This class action presents no difficulties of management that would preclude its maintenance as a class action.

## CAUSE OF ACTION

### (Violation of Section 1 of the Sherman Act – 15 U.S.C. §1)

109. Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs of this Amended Complaint.

110. Beginning at least as early as July 29, 2001, and continuing thereafter, Defendants and their co-conspirators, by and through their officers, directors, employees, agents, or other representatives, entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain, and/or stabilize prices for Aftermarket Automotive Lighting Products in the United States, and its territories and possessions, in violation of Section 1 of the Sherman Act (15 U.S.C. §1).

111. The contract, combination and conspiracy consisted of a continuing agreement, understanding and concert of action among the Defendants and their co-conspirators, the substantial terms of which were to fix, raise and maintain, or stabilize prices for Aftermarket Automotive Lighting Products and/or engage in market allocation for those services in the United States, its territories and possessions.

112. In formulating and effectuating the contract, combination or conspiracy, Defendants and their co-conspirators unlawfully combined and conspired to, among other acts:

571865_1

      (a)    agree to charge prices at certain levels and otherwise to fix, increase, maintain and/or stabilize prices of Aftermarket Automotive Lighting Products and/or allocate the market;

      (b)    exchange information on prices and sales volumes;

      (c)    implement and monitor the conspiracy among cartel members;

      (d)    market Aftermarket Automotive Lighting Products as being available at the agreed upon prices; and

      (e)    sell Aftermarket Automotive Lighting Products at the agreed-upon prices.

113.   The activities described above have been engaged in by Defendants and their co-conspirators for the purpose of effectuating the unlawful agreements to fix, maintain, raise and/or stabilize prices of Aftermarket Automotive Lighting Products and/or allocate the market for those products.

114.   The conspiracy had its intended effect, as Defendants benefited from their collusively-set price raises, as described herein.

115.   Defendants' unlawful conduct resulted in artificially high prices charged by Defendants and their co-conspirators to Plaintiffs and the members of the Class for Aftermarket Automotive Lighting Products.

116.   Plaintiffs and members of the Class had to pay more for Aftermarket Automotive Lighting Products than they would have paid in a competitive marketplace.

117.   Plaintiffs seek to recover for these overcharge damages.

118.   As a direct and proximate result of Defendants' scheme, Plaintiffs and the members of the Class have been injured and financially damaged in their respective businesses and property, in amounts which are presently undetermined. Plaintiffs' injuries consist of paying higher prices to purchase Aftermarket Automotive Lighting Products than they would have paid absent Defendants' conduct.

571865_1

1  Plaintiffs' injuries are of the type the antitrust laws were designed to prevent and flow

2  from that which makes Defendants' conduct unlawful.

3                                    **PRAYER FOR RELIEF**

4         WHEREFORE, Plaintiffs pray as follows:

5         A.     That the Court determines that this action may be maintained as a class

6  action under Rule 23 of the Federal Rules of Civil Procedure.

7         B.     That the contract, combination or conspiracy, and the acts done in

8  furtherance thereof by Defendants and their co-conspirators, be adjudged to have been

9  in violation of Section 1 of the Sherman Act (15 U.S.C. §1).

10        C.     That judgment be entered for Plaintiffs and members of the Class against

11  Defendants for three times the amount of damages sustained by Plaintiffs and the

12  Class as allowed by law, together with the costs of this action, including reasonable

13  attorneys' fees.

14        D.     That Defendants, their affiliates, successors, transferees, assignees, and

15  the officers, directors, partners, agents and employees thereof, and all other persons

16  acting or claiming to act on their behalf, be permanently enjoined and restrained from,

17  in any manner:

18        (1)    continuing, maintaining or renewing the contract, combination or

19  conspiracy alleged herein, or from engaging in any other contract, combination

20  or conspiracy having a similar purpose or effect, and from adopting or

21  following any practice, plan, program or device having a similar purpose or

22  effect; and

23        (2)    communicating or causing a communication to any other person

24  engaged in the manufacture, distribution or sale of any relevant product except

25  to the extent necessary in connection with a bona fide sales transaction between

26  the parties to such communications.

27

28

571865_1

1      E.    That Plaintiffs and members of the Class have such other, further and

2 different relief as the case may require and the Court may deem just and proper under

3 the circumstances.

### JURY DEMAND

5     Plaintiffs demand a jury trial, pursuant to Federal Rule of Civil Procedure 38(b),

6 of all triable issues.

7 DATED:   July 22, 2010

ROBBINS GELLER RUDMAN
   & DOWD LLP
BONNY E. SWEENEY
THOMAS R. MERRICK
PAULA M. ROACH

_____
BONNY E. SWEENEY

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

STUEVE SIEGEL HANSON, LLP
JASON S. HARTLEY
JASON M. LINDNER
550 West C Street, Suite 610
San Diego, CA 92101
Telephone: 619/400-5822
619/400-5832 (fax)

HAUSFELD LLP
MICHAEL P. LEHMANN
JON T. KING
44 Montgomery Street, Suite 3400
San Francisco, CA 94104
Telephone: 415/633-1908
415/358-4980 (fax)

HAUSFELD LLP
MICHAEL D. HAUSFELD
HILARY K. RATWAY
1700 K Street NW, Suite 650
Washington, DC 20006
Telephone: 202/579-1089
202/747-5713 (fax)

- 38 -

571865_1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

LABATON SUCHAROW LLP
JAY L. HIMES
HOLLIS L. SALZMAN
WILLIAM V. REISS
140 Broadway, 34th Floor
New York, NY 10005
Telephone: 212/907-0700
212/818-0477 (fax)

Plaintiffs' Interim Co-Lead Counsel

571865_1

## DECLARATION OF SERVICE BY ELECTRONIC MAIL AND U.S. MAIL

I, the undersigned, declare:

1.     That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of the County of San Diego, over the age of 18 years, and not a party to or interested party in the within action; that declarant's business address is 655 West Broadway, Suite 1900, San Diego, California 92101.

2.     That on July 22, 2010, declarant served the AMENDED CONSOLIDATED CLASS ACTION COMPLAINT [REDACTED] on the parties in the within action by e-mail addressed as follows:   mblecher@blechercollins.com, tlang@morganlewis.com, dbrownstein@orrick.com and epenson@jonesday.com.

3.     That on July 22, 2010, declarant served the AMENDED CONSOLIDATED CLASS ACTION COMPLAINT [REDACTED] by depositing a true copy thereof in a United States mailbox at San Diego, California in a sealed envelope with postage thereon fully prepaid and addressed to the parties listed on the attached Service List.

4.     That there is a regular communication by mail between the place of mailing and the places so addressed.

I declare under penalty of perjury that the foregoing is true and correct. Executed on July 22, 2010, at San Diego, California.

SHONDA L. LANDRY

571865_1

- 40 -

# MANUAL SERVICE LIST

Allan Steyer
Holly Stirling
Jayne A. Peeters
Steyer Lowenthal Boodrookas Alvarez & Smith
One California Street, Suite 300
San Francisco, CA 94111

Donald Amamgbo
Amamgbo & Associates PLC
6167 Bristol Parkway Suite 325
Culver City, CA 90230

Michelle Akerman
Henry A. Cirillo
Steyer Lowenthal Boodrookas Alvarez & Smith
One California Street, Suite 300
San Francisco, CA 94111

Reginald Terrell
Terrell Law Group
P.O. Box 13315
PMB 148
Oakland, CA 94661

Michael P. Lehmann
Arthur N. Bailey
Jon T. King
Christopher L. Lebsock
Hausfeld LLP
44 Montgomery Street Suite 3400
San Francisco, CA 94104

Maxwell M. Blecher
Courtney A Palko
Blecher and Collins
515 S Figueroa Street Suite 1750
Los Angeles, CA 90071

David Brownstein
Stephen V. Bomse
Orrick Herrington and Sutcliffe LLP
405 Howard Street
San Francisco, CA 94105-2669

Lori S. Brody
Kaplan Fox & Kilsheimer LLP
1801 Century Park East, Suite 1440
Los Angeles, CA 90067

Francis O. Scarpulla
Craig C. Corbitt
Zelle Hofmann Voelbel & Mason LLP
44 Montgomery Street, Suite 3400
San Francisco, CA 94104

David W. Stanley
Jonathan W. Cuneo
Cuneo Gilbert and LaDuca LLP
507 C Street NE
Washington, DC 20002

Stephen Dampier
Law Offices of M Stephen Dampier PC
55 North Section Street
Fairhope, AL 36532

Donald F. Woods, Jr.
Roderick G. Dorman
James P. Habel
Hennigan Bennett & Dorman LLP
865 South Figueroa Street Suite 2900
Los Angeles, CA 90017

Margaret Mullin Weems
Lori A. Fanning
Miller Law LLC
115 South LaSalle Street Suite 2910
Chicago, IL 60603

Michael D. Hausfeld
Hilary K. Ratway
Hausfeld LLP
1700 K Street NW, Suite 650
Washington, DC 20006

Jason S. Hartley
Jason M. Lindner
Stueve Siegel Hanson LLP
550 West C Street Suite 610
San Diego, CA 92101

William V. Reiss
Jay L. Himes
Labaton Sucharow LLP
140 Broadway
New York, NY 10005

Christina Liza Sein
Brian Ming Hom
Morgan Lewis & Bockius LLP
300 South Grand Avenue, Suite 2200
Los Angeles, CA 90071-3132

Jason S. Kilene
Gustafson Gluek PLLC
650 Northstar East Building
608 Second Avenue South
Minneapolis, MN 55402

Susan G. Kupfer
Glancy Binkow and Goldberg
One Embarcadero Center Suite 760
San Francisco, CA 94111

Eric P. Enson
Kathleen P. Wallace
Jeffrey A. LeVee
Jones Day
555 South Flower Street, 50th Floor
Los Angeles, CA 90071

Jacklin Chou Lem
United States Department of Justice
Antitrust Division
450 Golden Gate Avenue Room 10-0101
Box 36046
San Francisco, CA 94102-3478

Brigid S Martin
US Department of Justice
450 Golden Gate Avenue Room 10-0101 Box 36046
San Francisco, CA 94102-3478

Marvin A Miller
Miller Law LLC
115 South LaSalle Street, Suite 2910
Chicago, IL 60603

Jon A Tostrud
Cuneo Gilbert & LaDuca LLP
1801 Century Park East, 2nd Floor
Los Angeles, CA 90067

Thomas Lang
Morgan Lewis & Bockius LLP
1111 Pennsylvania Avenue, N.W.
Washington, DC 20004

**Appendix A**

| Company | Product Number |
|---------|----------------|
| TYC Brother Industrial Co., LTD. | 12-5026-01 |
| | 12-5025-01 |
| | 18-5220-00 |
| | 18-5219-00 |
| | 12-5172-00 |
| | 12-5171-00 |
| | 12-1540-01 |
| | 12-1539-01 |
| | 20-6062-00 |
| | 20-6061-00 |
| | 12-5054-01 |
| | 12-5053-01 |
| | 18-1921-00 |
| | 18-1920-00 |
| | 18-3372-61 |
| | 18-3371-61 |
| | 18-3121-01 |
| | 18-3120-01 |
| | 20-5962-00 |
| | 20-5961-00 |
| | 12-1516-01 |
| | 12-1515-01 |
| | 20-3164-88 |
| | 20-3163-88 |
| | 20-6022-00 |
| | 20-6021-00 |
| | 20-3075-00 |
| | 20-3074-00 |
| | 18-3458-00 |
| | 18-3457-00 |
| | 18-3121-91 |

- 44 -

| Company | Product Number |
|---------|----------------|
|  | 18-3120-91 |
|  | 20-6288-00 |
|  | 20-6287-00 |
|  | 20-1973-00 |
|  | 20-1972-00 |
|  | 18-3534-91 |
|  | 18-3533-91 |
|  | 20-3101-00 |
|  | 20-3100-00 |
|  | 20-3071-00 |
|  | 20-3070-00 |
|  | 20-5812-00 |
|  | 20-5811-00 |
|  | 20-1845-00 |
|  | 20-1844-00 |
|  | 18-5530-01 |
|  | 18-5529-01 |
|  | 20-3009-00 |
|  | 20-3008-00 |
|  | 20-3388-00 |
|  | 20-3387-00 |
|  | 12-1552-90 |
|  | 12-1551-90 |
| Genera Corporation | 12-5026-01 |
|  | 12-5025-01 |
|  | 18-5220-00 |
|  | 18-5219-00 |
|  | 12-5172-00 |
|  | 12-5171-00 |
|  | 12-1540-01 |
|  | 12-1539-01 |
|  | 20-6062-00 |
|  | 20-6061-00 |

- 45 -

| Company | Product Number |
|---|---|
|  | 12-5054-01 |
|  | 12-5053-01 |
|  | 18-1921-00 |
|  | 18-1920-00 |
|  | 18-3372-61 |
|  | 18-3371-61 |
|  | 18-3121-01 |
|  | 18-3120-01 |
|  | 20-5962-00 |
|  | 20-5961-00 |
|  | 12-1516-01 |
|  | 12-1515-01 |
|  | 20-3164-88 |
|  | 20-3163-88 |
|  | 20-6022-00 |
|  | 20-6021-00 |
|  | 20-3075-00 |
|  | 20-3074-00 |
|  | 18-3458-00 |
|  | 18-3457-00 |
|  | 18-3121-91 |
|  | 18-3120-91 |
|  | 20-6288-00 |
|  | 20-6287-00 |
|  | 20-1973-00 |
|  | 20-1972-00 |
|  | 18-3534-91 |
|  | 18-3533-91 |
|  | 20-3101-00 |
|  | 20-3100-00 |
|  | 20-3071-00 |
|  | 20-3070-00 |
|  | 20-5812-00 |

571752_1

| Company | Product Number |
|---|---|
| | 20-5811-00 |
| | 20-1845-00 |
| | 20-1844-00 |
| | 18-5530-01 |
| | 18-5529-01 |
| | 20-3009-00 |
| | 20-3008-00 |
| | 20-3388-00 |
| | 20-3387-00 |
| | 12-1552-90 |
| | 12-1551-90 |
| Depo Auto Parts Industrial Co., LTD | 332-1645L-US |
| | 332-1645R-US |
| | 312-1553L-AS |
| | 312-1533R-AS |
| | 312-1638L-AS |
| | 312-1638R-AS |
| | 332-1615L-US |
| | 332-1615-R-US |
| | 330-1113L-AS |
| | 330-1113R-AS |
| | 332-1660L-US |
| | 332-1660R-US |
| | 312-1505L-AS |
| | 312-1505R-AS |
| | 331-1538L-USN |
| | 331-1538R-USN |
| | 331-1532L-US |
| | 331-1532R-US |
| | 312-1148L-AS |
| | 312-1148R-AS |
| | 332-1618L-US |
| | 332-1618R-US |

- 47 -

| Company | Product Number |
|---|---|
| | 333-1110L-AS |
| | 330-1110R-AS |
| | 334-1103L-AS |
| | 334-1103R-AS |
| | 331-1124L-AS |
| | 331-1124R-AS |
| | 312-1520L-AS |
| | 312-1520R-AS |
| | 331-1532L-US-Y |
| | 331-1532R-US-Y |
| | 335-117L-AS |
| | 335-1117R-AS |
| | 331-1113L-AS |
| | 331-1113R-AS |
| | 332-1625I-US-Y |
| | 332-1625R-US-Y |
| | 331-1122L-AS |
| | 331-1122R-AS |
| | 333-1109L-AS |
| | 333-1109R-AS |
| | 312-1146L-AS |
| | 312-1146R-AS |
| | 317-1106L-CSA |
| | 317-1106R-CSA |
| | 332-1580L-US |
| | 332-1580R-US |
| | 312-1107L-AS |
| | 312-1107R-AS |
| | 332-1154L-AS |
| | 332-1154R-AS |
| | 312-1612L-AS6 |
| | 312-1612R-AS6 |

- 48 -

| Company | Product Number |
|---------|----------------|
| Maxzone Vehicle Lighting Corp. | 332-1645L-US |
| | 332-1645R-US |
| | 312-1553L-AS |
| | 312-1533R-AS |
| | 312-1638L-AS |
| | 312-1638R-AS |
| | 332-1615L-US |
| | 332-1615-R-US |
| | 330-1113L-AS |
| | 330-1113R-AS |
| | 332-1660L-US |
| | 332-1660R-US |
| | 312-1505L-AS |
| | 312-1505R-AS |
| | 331-1538L-USN |
| | 331-1538R-USN |
| | 331-1532L-US |
| | 331-1532R-US |
| | 312-1148L-AS |
| | 312-1148R-AS |
| | 332-1618L-US |
| | 332-1618R-US |
| | 333-1110L-AS |
| | 333-1110R-AS |
| | 334-1103L-AS |
| | 334-1103R-AS |
| | 331-1124L-AS |
| | 331-1124R-AS |
| | 312-1520L-AS |
| | 312-1520R-AS |
| | 331-1532L-US-Y |
| | 331-1532R-US-Y |
| | 335-117L-AS |

| Company | Product Number |
|---|---|
| | 335-1117R-AS |
| | 331-1113L-AS |
| | 331-1113R-AS |
| | 332-1625I-US-Y |
| | 332-1625R-US-Y |
| | 331-1122L-AS |
| | 331-1122R-AS |
| | 333-1109L-AS |
| | 333-1109R-AS |
| | 312-1146L-AS |
| | 312-1146R-AS |
| | 317-1106L-CSA |
| | 317-1106R-CSA |
| | 332-1580L-US |
| | 332-1580R-US |
| | 312-1107L-AS |
| | 312-1107R-AS |
| | 332-1154L-AS |
| | 332-1154R-AS |
| | 312-1612L-AS6 |
| | 312-1612R-AS6 |
| Eagle Eyes Traffic Industrial Co., LTD. | GM181-U000L |
| | GM181-U000R |
| | TY562-B000L |
| | TY562-B000R |
| | TY685-B000L |
| | TY685-B000R |
| | GM096-U000L |
| | GM096-U000R |
| | FR350-B001L |
| | FR350-B001R |
| | GM165-U000L |
| | GM165-U000R |

- 50 -

| Company | Product Number |
|---------|----------------|
|         | TY418-B000L    |
|         | TY418-B000R    |
|         | FR207-U100L    |
|         | FR207-U100R    |
|         | FR113-U000L    |
|         | FR113-U000R    |
|         | TY676-B001L    |
|         | TY676-B001R    |
|         | GM121-U000L    |
|         | GM121-U000R    |
|         | CS041-B001L    |
|         | CS041-B001R    |
|         | CS090-B001L    |
|         | CS090-B001R    |
|         | FR112-B001L    |
|         | FR112-B001R    |
|         | TY531-B000L    |
|         | TY531-B000R    |
|         | FR113-U100L    |
|         | FR113-U100R    |
|         | GM235-B001L    |
|         | GM235-BOO1R    |
|         | FR124-B001L    |
|         | FR124-B001R    |
|         | GM114-U000L    |
|         | GM114-U000R    |
|         | FR186-B001L    |
|         | FR186-B001R    |
|         | CS024-B001L    |
|         | CS024-B001R    |
|         | TY638-B001L    |
|         | TY638B001R     |
|         | HG120B001L     |

| Company | Product Number |
|---------|----------------|
|  | HD120-B001R |
|  | GM214-U000L |
|  | GM214-U000R |
|  | TY498-B001L |
|  | TY498-B001R |
|  | GM161-B001L |
|  | GM161-B0014 |
|  | TY547-B000L |
|  | TY547-B000R |
| E-Lite Automotive, Inc. | GM181-U000L |
|  | GM181-U000R |
|  | TY562-B000L |
|  | TY562-B000R |
|  | TY685-B000L |
|  | TY685-B000R |
|  | GM096-U000L |
|  | GM096-U000R |
|  | FR350-B001L |
|  | FR350-B001R |
|  | GM165-U000L |
|  | GM165-U000R |
|  | TY418-B000L |
|  | TY418-B000R |
|  | FR207-U100L |
|  | FR207-U100R |
|  | FR113-U000L |
|  | FR113-U000R |
|  | TY676-B001L |
|  | TY676-B001R |
|  | GM121-U000L |
|  | GM121-U000R |
|  | CS041-B001L |
|  | CS041-B001R |

571752_1

| Company | Product Number |
|---------|----------------|
|         | CS090-B001L |
|         | CS090-B001R |
|         | FR112-B001L |
|         | FR112-B001R |
|         | TY531-B000L |
|         | TY531-B000R |
|         | FR113-U100L |
|         | FR113-U100R |
|         | GM235-B001L |
|         | GM235-BOO1R |
|         | FR124-B001L |
|         | FR124-B001R |
|         | GM114-U000L |
|         | GM114-U000R |
|         | FR186-B001L |
|         | FR186-B001R |
|         | CS024-B001L |
|         | CS024-B001R |
|         | TY638B-001L |
|         | TY638B001R |
|         | HG120B001L |
|         | HD120-B001R |
|         | GM214-U000L |
|         | GM214-U000R |
|         | TY498-B001L |
|         | TY498-B001R |
|         | GM161-B001L |
|         | GM161-B0014 |
|         | TY547-B000L |
|         | TY547-B000R |

- 53 -

# Exhibits 1-15
# [filed conditionally under seal]